## Hanson v. Wilkes-Barre Building Trades Council

*Max Rosenn* and *Henry Greenwald*, for plaintiff.

*James L. Brown* and *Joseph B. Farrell*, for defendant.

PINOLA, J., July 18, 1956.—On July 5, 1956, at the instance of plaintiff, a preliminary injunction was granted by President Judge Valentine restraining defendants from picketing plaintiff's new building on State Highway Route 115, Dallas Township, and from intimidating, molesting and interfering with tradesmen, persons endeavoring to deliver and install bowling alleys, pin setters and other equipment and other persons who may seek ingress and egress from plaintiff's premises.

At the hearing held July 9, 1956, on plaintiff's motion to continue the same, defendants presented a written motion to dismiss the bill and dissolve the injunction.

From the evidence adduced it appears that plaintiff entered into a general contract for the construction of a business building with Whitesell Brothers. The work was begun during the latter part of March and was completed on June 24, 1956. There remain to be installed air conditioning, for which a contract has been awarded to the Armco Distributing Company, bowling lanes to be provided by the Brunswick-Balke-

Callender Company, at a cost of $37,000, pin setters to be installed by the Brunswick-Otis-Murray Corporation, at a cost of $76,000, and booths built by the Rex Sales Company. The building cost plaintiff $70,000, and for the land upon which it is located he paid $9,500.

About April 1, 1956, pickets began to patrol the highway in front of the premises carrying signs bearing the legend: "This job is being picketed by Wyoming Valley Building Trades for Organizational purposes."

On the reverse side the words "Wyoming Valley" were changed to "Wilkes-Barre."

Whitesell Brothers did not employ union labor on the job nor did the subcontractors, Michael Kerestes, who did the electrical work, and C. W. Schultz, who did the plumbing work.

Some of the suppliers of equipment have endeavored to make deliveries but the drivers, after talking to the pickets, refuse to cross the picket line. Others, having learned of the picket line, refuse to install the equipment because the contracts with their employes prevent them from delivering equipment where labor trouble exists.

The picketing is peaceful and there is no disturbance. One picket walks along the property and another sits in a parked car. The latter gets out and talks to the drivers of trucks who approach the premises. Then they leave.

The pickets were installed by direction of the Wyoming Valley Building Trades Council, which is composed of representatives of various trade unions.

Defendants contend that once having acquired the right to peacefully picket the premises, they cannot be restrained from continuing to do so merely because the remaining work to be done will be done by union labor. They are willing to change the legend on their

signs to read: "Robert Hanson is unfair to organized labor."

Plaintiff, on the other hand, contends that there is no labor dispute, that there can be none because he has no employes and that if a dispute had existed between defendants and Whitesell Brothers, there are no longer any employes of Whitesell Brothers on the premises, and hence the picketing, even if proper at its inception, can no longer legally continue.

## Discussion

Of course, there is no labor dispute between plaintiff and defendants for the obvious reason that there can be none. That being so, this court has jurisdiction to exercise its normal equity powers: Bright v. Pittsburgh Musical Society, etc., 379 Pa. 335, 343.

Since plaintiff has no employes and only the general contractor and his subcontractor had employes working on the premises, it is fair to conclude from the legend on the signs carried by the pickets that the purpose of the picketing is to apply pressure on plaintiff and conscript him into assisting defendants in organizing the employes of Whitesell Brothers, Michael Kerestes and C. W. Schultz. Such conduct is illegal and in violation of the Pennsylvania Labor Relations Act of June 1, 1937, P. L. 1168, sec. 6 (2) (d), as amended, 43 PS §211.6, which provides that it shall be an unfair labor practice for an organization, its officers or agents, or anyone acting in its interest:

"(d) to engage in a secondary boycott, or to hinder or prevent by threats, intimidation, force, coercion or sabotage the obtaining, use or disposition of materials, equipment or services, or to combine or conspire to hinder or prevent by any means whatsoever, the obtaining, use or disposition of materials, equipment or services."

The facts in this case are quite similar to those in

Piezonki v. National Labor Relations Board, 219 F. 2d 879 (fourth circuit, 1955). There the court reversed the National Labor Relations Board which refused to award an injunction restraining picketing by the Construction Trades Council (an organization of labor unions) which amounted to a secondary boycott. In an effort to force the primary contractor to operate a 100 percent union shop, the trades council placed a picket line around the construction project which union employes of subcontractors refused to cross. No notice was given that the picketing related only to the primary contractor or that it was not directed toward union subcontractors. The signs merely gave notice that the job was being picketed for organization purposes. The court declared, page 881:

"It is no answer to this to say that the campaign was an organizational campaign and that the picket signs so indicated. The picketing was done at premises where business of the subcontractors as well as business of the contractor was being carried on; and everyone knew that it would affect, not the non-union employees of the general contractors, but the union employees of the subcontractors, and it is idle to suggest that it was not engaged in for this purpose."

It concluded that the object of the picketing was to bring pressure on the general contractors by the exercise of a secondary boycott which it held to be illegal.

In N. L. R. B. v. Local Union 55, 218 F. 2d 226, a picket line was established at a construction site where building was being carried on by a nonunion insurance company as general employer, and a number of union subcontractors. There, as here, no notice was given that the picketing was not directed at the union subcontractors, with the result that their employes refused to work on the job. The picketing was, therefore, held to be illegal.

If the picketing is for the purpose of compelling the general contractor to recognize defendants as the bargaining agent, then such conduct violates the Pennsylvania Labor Relations Act, sec. 6(2)(a), 43 PS §211.6, because its purpose is:

"To intimidate, restrain, or coerce any employe for the purpose and with the intent of compelling such employe to join or to refrain from joining any labor organization, or for the purpose or with the intent of influencing or affecting his selection of representatives for the purposes of collective bargaining."

To the same effect are the decisions in Anchorage, Inc., v. Waiters' & Waitresses' Union, 383 Pa. 547 (1956), and Baderak v. Building and Construction Trades Council, 380 Pa. 477.

The decision in Individual Retail Food Store Owners Assocation v. Penn Treaty Food Stores Association, 33 D. & C. 100, does not, as claimed, help defendants. As the court there pointed out, "essentially, picketing has become a publicity medium, designed to advise the public of the existence of a controversy *between those picketing and the one picketed.*" (Italics supplied.)

There is no controversy here. Plaintiff has no employes. Defendants are trying to punish plaintiff for having engaged a nonunion general contractor. Through their course of conduct they would prevent the installation of needed equipment costing upwards of $113,000, even though the same was manufactured and is to be installed by union employes. Put simply, defendants aim to cause grave economic loss to plaintiff by preventing the use of his building.

The willingness of defendants to change the legend to "Robert Hanson is unfair to organized labor", does not help the situation. Having no employes, how can it be truthfully said that plaintiff is unfair to organized labor? Moreover, while the building constructed by

unorganized labor cost $70,000, the equipment to be installed by organized labor cost $113,000. In any event, the proposed legend would not be a true statement.

In Getreu v. Truck Drivers & Helpers Union No. 728, IBT-AFL, 26 Labor Cases 87, 327 (1954), the U. S. District Court, Northern District of Georgia, held that picketing when the employes of a nonunion employer are not on the premises is illegal. Here there will be no occasion for the return of any employes of Whitesell Brothers to the premises. How then can the picketing be justified?

If there be a dispute between defendants and Whitesell Brothers, why do not defendants picket the main office and yard of Whitesell Brothers, which is located only a half mile away?

In Brewery and Beverage Drivers, etc., v. N. L. R. B., 220 F. 2d 380, the court held that since an employer had its permanent place of business which could be and was being picketed, the "ambulatory situs" doctrine did not apply and picketing of the employer's customers constituted unlawful picketing of secondary employers.

And in another case, American Iron and Machine Works, 115 N. L. R. B. No. 121, issued March 15, 1956, the majority found that I. A. M.'s roving situs picketing was bad because American Iron's primary premises were available for such purposes and because the pickets failed to disclose that their dispute was with American Iron only.

Here the pickets talked to the truck drivers and thus prevented deliveries. Why did they make no effort to communicate with the workmen of Whitesell Brothers who were on the premises? Why did they not hold a meeting or create an occasion at which they might urge the employes of Whitesell Brothers to

join their unions? Failures in these respects can only lead to the conclusion that the picketing is directed at plaintiff.

Under the circumstances, we are required to and do enter the following

*Order*

Now, July 18, 1956, at 9:45 a. m., after due hearing, defendants' motion to dissolve the injunction is denied and, on motion of Max Rosenn, Esq., and Henry Greenwald, Esq., attorneys for plaintiff, it is ordered, adjudged and decreed that the preliminary injunction heretofore issued in this case, be, and the same is, continued until the final hearing of this case or until further order of this court, the security heretofore entered by plaintiff to be continued.