218 F.2d 226
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LOCAL UNION NO. 55; and Carpenters District Council of Denver and Vicinity, Affiliated With United Brotherhood of Carpenters and Joiners of America, A. F. of L., Respondents.
 No. 4926.
 United States Court of Appeals, Tenth Circuit.
 December 31, 1954.
 
 Samuel M. Singer, Atty., Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, Abraham Siegel, Atty., Washington, D. C., were with him on the brief), for petitioner.
 Wayne D. Williams, Denver, Colo., for respondents.
 Before PHILLIPS, Chief Judge, and MURRAH and PICKETT, Circuit Judges.
 PHILLIPS, Chief Judge.
 
 
 1
 This is a petition to enforce an order of the National Labor Relations Board. The Professional and Business Men's Life Insurance Company[1] is a Colorado corporation with its principal offices in Denver, Colorado. It is primarily engaged in the insurance business in a number of states, including Colorado. To provide available investments for the funds received from the insurance business, the Insurance Company engages in the construction and sale of residential dwellings in Denver and vicinity and has over $1,000,000 invested in mortgages on houses built and sold by it. Its construction operations are controlled and supervised by James C. Ely, its Denver office manager. Acting as its own general contractor, the Insurance Company completed 65 houses during 1952, and from January 1, 1953 to June 30, 1953, had completed or was in the process of constructing more than 100 houses in Denver and vicinity. In 1952 it expended $386,000 and during the first six months of 1953, $269,000, exclusive of the cost of land and labor, in its building operations. These amounts included $180,000 for building materials purchased in Colorado, but manufactured in other states.
 
 
 2
 At the inception of its construction business the Insurance Company employed Kirkland Brothers as its general contractor to construct its projects. However, since May, 1952, it has acted as its own general contractor and as such has employed carpenters, cabinet makers, painters, floor finishers and laborers. In addition, it has contracted with various subcontractors to perform specialized construction work on its projects. Although several of these subcontractors had signed collective bargaining contracts with different building trades unions, the Insurance Company operated an open shop, resulting in its appearing on the Unfair List of Local Union No. 55 and Carpenters' District Council[2] beginning about March 27, 1953.
 
 
 3
 The respondents had long been disturbed by the fact that union members had been working on projects of the Insurance Company alongside nonunion men, in violation of the By-Laws and Working Rules of Local 55 and the Working Rules of the District Council, both of which provide that "No member shall work where a non-union man is employed on any work coming under our jurisdiction * * *." Alex Mazaro, delegate of both respondents, took steps to correct such practice by exerting pressure on the Insurance Company and subcontractors of the Insurance Company, with the purpose to unionize the employees of the Insurance Company.
 
 
 4
 At a meeting held on December 15, 1952, Mazaro advised a group of union flooring contractors that they were violating union rules by working on nonunion projects. Mazaro warned these contractors that by January 1, 1953, unless the nonunion men on such projects were replaced by union members, the subcontractors would have to cease doing their work with union members, so that union members would not have to work with nonunion men. The flooring contractors countered with a proposal that respondents modify their prohibition against union carpenters working on projects employing nonunion men, but such proposal was rejected by the respondents. Thereafter, Mazaro repeatedly warned the flooring contractors that if their employees "were caught working on a nonunion job with nonunion men, * * * that man would be warned first and charges preferred against him, second, * * *." The Working Rules of both respondents provide for the imposition of fines against or expulsion of members violating the Rules. Mazaro warned Cromwell, a flooring subcontractor, that the rest of his men would be taken away from him and he would be placed on an Unfair List if he continued to work his men on nonunion projects. Despite Mazaro's warning Cromwell continued his work on the Insurance Company project until after January 1, 1953, the deadline set by Mazaro.
 
 
 5
 On January 27, 1953, Mazaro informed Cromwell he had found one of Cromwell's employees, Vincent Rossi, working on the nonunion Insurance Company project, contrary to union rules and beyond the January 1 deadline. Mazaro repeated his warning that such practice would have to be discontinued or he would take the rest of Cromwell's men away from him and that Cromwell was placing his employees "in jeopardy of having charges filed against them with Local 55." Cromwell protested that he had a written contract with the Insurance Company and that he did not want to give up the work, which he very much needed. Mazaro replied that he did not think it would be necessary for Cromwell to lose the work, since if the respondents could make it difficult enough for the Insurance Company to do its work, that possibly its employees would join the Union and the Insurance Company's subcontractors could retain and complete their contracts. As a result Cromwell removed Rossi from the Insurance Company job. Later that day, or the next day, Cromwell dispatched Employee Anderson to work on the Insurance Company project. Before reporting for the job Anderson requested Union Shop Steward Holmes to get Mazaro's permission for him to work. Holmes called Mazaro and the latter told him that Cromwell's employees could not work on the Insurance Company's project and that they would face Union charges if they did. Holmes transmitted that information to Anderson and two other Cromwell employees who stood nearby. Holmes also apprised Cromwell of his conversation with Mazaro and Cromwell later reassigned his employees to other jobs. Cromwell then acceded to respondents' pressures and informed the Insurance Company he could not perform his contract, citing difficulties with the respondents as the cause. As a result, the Insurance Company was forced to purchase floor surfacing and polishing machines and do its own floor surfacing and laying.
 
 
 6
 Following his earlier warnings to the flooring contractors, on January 14, 1953, Mazaro commenced to direct his attack against the Insurance Company. On that day he requested Ely to recognize Local 55 as bargaining agent and to "work union people on (the) job." Ely replied that it was a matter for the Insurance Company employees to decide. Later, and at a time when Mazaro was continuing pressure on Cromwell, Mazaro again met with Ely and requested Union recognition and gave Ely a form of contract for recognition of Local 55. That contract incorporated the Union's Working Rules. Mazaro also left Ely a copy of the Union's Working Rules. Ely again replied that it was up to the Insurance Company's employees to determine whether they wanted Local 55 as a bargaining representative and gave Mazaro permission to talk to the Insurance Company's employees. In February, 1953, Mazaro discussed the Union with the Insurance Company's employees at the job site. Thereafter, he polled the employees on the question whether they wished Local 55 to act as their bargaining agent. The employees voted 19 to 1 against Local 55 acting as their bargaining agent.
 
 
 7
 Following that, Mazaro again met with Ely and threatened to picket the Insurance Company's project, because "there were union and nonunion men on the job."
 
 
 8
 In February, 1953, Mazaro called a special meeting of union floor-laying employees of various employers, including Cromwell, and warned them that they would be subjected to penalties if they were caught working on nonunion jobs.
 
 
 9
 Mazaro also exerted pressure on John Mullican, an Insurance Company subcontractor and member of Local 55, to induce him not to work on the Insurance Company's project. About January 31, 1953, at a time when Mullican was engaged as a roofing subcontractor on the Insurance Company's project, Mazaro notified Mullican that he was violating union rules by working on a nonunion project. Sometime later, in a conversation at the job site, where Mullican's employees were at work, Mazaro informed Mullican that he would have to quit that work or face charges. Mullican refused to give up his contract with the Insurance Company and his employees were at work on the project when, on April 1, 1953, respondents' pickets appeared at the job site. On April 3, 1953, Mazaro preferred charges against Mullican, and on May 12, 1953, the District Council fined him $500.
 
 
 10
 Unsuccessful in their efforts to force the Insurance Company to sign a collective bargaining agreement, respondents on March 27, 1953, placed the Insurance Company on their Unfair List. About that time Mazaro notified Cliff Gould, a business agent of the Denver Building and Construction Trades Council, that respondents would soon begin picketing the Insurance Company's project. Shortly thereafter, John B. Chase, president of the Carpenters' District Council, directed Mazaro to picket the project. On April 1, 1953, respondents posted two pickets on the project with signs reading: "Working Conditions on This Job Unfair to Carpenters' District Council." The sign did not name the Insurance Company or otherwise identify it as the employer with which the respondents were in controversy. At work on the project when the pickets appeared were the Insurance Company's employees and employees of Price Plumbing and Supplies, one of the Insurance Company's subcontractors. None of these employees left their jobs at that time. On the following day Mazaro also informed the business agent of the Electricians' Union that the respondents had placed a picket line at the Insurance Company's project.
 
 
 11
 On April 3, 1953, picketing ceased because of a state court temporary restraining order, but was resumed April 27, 1953, upon the dissolution of that order. Picketing continued from the latter date until the early part of June, 1953. On April 27, 1953, employees of Price Plumbing and Supplies and of John Mullican were at work on the project. Upon the resumption of picketing, the employees of both subcontractors left their jobs.
 
 
 12
 The Board found that in view of respondents' failure to disclose on the picket signs that the picketing was directed solely against the Insurance Company, and in view of the respondents' past efforts to bring pressure upon subcontractors to cease doing business with the Insurance Company, the picketing was directed in part against the secondary employers.
 
 
 13
 The Board found that the purpose of respondents' picketing of the Insurance Company's project was to induce and encourage the employees of Price Plumbing and Supplies to withhold their services from their employer, in order to force Price Plumbing and Supplies to cease doing business with the Insurance Company, and by that means compel the Insurance Company to recognize one of the respondents, neither of which was certified under § 9 of the National Labor Relations Act,[3] as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., as the bargaining agent of its employees.
 
 
 14
 The Board also found that since the contract which respondents undertook to force the Insurance Company to enter into incorporated the Union's Working Rules, prohibiting union members from working alongside of nonunion employees, it in effect contained an illegal union-security arrangement calling for discrimination against nonunion employees.
 
 
 15
 The Board concluded that by picketing to force the Insurance Company to enter into the contract, respondents attempted to cause the Insurance Company to violate § 8(a) (3) of the Act, thereby themselves violating § 8(b) (2) of the Act.
 
 
 16
 The Board ordered the respondents to cease and desist from the unfair labor practices found and to post the usual notices.
 
 
 The 8(b) (4) (A, B) Violations
 
 
 17
 Section 8(b) (4) (A) of the Act is designed to protect innocent third persons from economic loss as a result of a labor dispute in which they have no concern.[4]
 
 
 18
 "The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands."[5]
 
 
 19
 Clearly, here, the dispute was between the respondents, who demanded that the Insurance Company recognize one of them as the bargaining representative of its employees and cease working nonunion men, and the Insurance Company which resisted such demands.
 
 
 20
 Mere incidental effect on the secondary employer is not enough to constitute a secondary boycott. Where there is no geographic separation between the work situs of the primary employer and the work situs of a neutral employer, that is, where the primary and secondary employers occupy a common work site, it is not easy to draw the line between permissible primary action and proscribed secondary action. It must be determined by balancing "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own."[6] To reconcile these conflicting interests, the Board in Sailors' Union of the Pacific, 92 N.L.R.B. 547, 549, evolved criteria for determining when picketing at a common situs would be considered legitimate primary picketing or unlawful secondary picketing and the Board stated that picketing at such a situs is primary and permissible only if it meets all of the four following conditions:
 
 
 21
 "(a) The picketing is strictly limited to times when the situs of dispute is located on the secondary employer's premises;
 
 
 22
 "(b) at the time of the picketing the primary employer is engaged in its normal business at the situs;
 
 
 23
 "(c) the picketing is limited to places reasonably close to the location of the situs; and
 
 
 24
 "(d) the picketing discloses clearly that the dispute is with the primary employer."
 
 
 25
 In N. L. R. B. v. Service Trade Chauffeurs, Salesmen & Helpers, 2 Cir., 191 F.2d 65, 68, the court approved such criteria as a sound interpretation of the Act.
 
 
 26
 Here, at the common situs, construction work was being carried on by the Insurance Company, the primary employer, and by certain subcontractors. The object of the picketing was to compel the Insurance Company to recognize one of the respondents as the bargaining agent for its employees and to cease working nonunion men alongside of union members. The picketing signs were not directed at the primary employer alone, but at the project, at which secondary employers were also working. It read: "Working Conditions on This Job Unfair to Carpenters' District Council." It is a reasonable inference from the evidence that a primary purpose of the picketing was to cause the employees of the subcontractors to cease working on the project and prevent the subcontractors from completing the construction under their subcontracts, as a means of compelling the Insurance Company to recognize one of the respondents as the bargaining agent for its employees and to cease working nonunion men on the project. That was the only way that the respondents could accomplish their objectives, so long as union employees of the subcontractors were willing to work on the project with nonunion employees of the Insurance Company and the nonunion employees of the Insurance Company were unwilling to recognize either of the respondents as their bargaining agent and to become members of the Union.
 
 
 27
 We conclude that under the undisputed facts and the reasonable inferences deductible therefrom, which it was the peculiar province of the Board to determine, the Board was fully warranted in concluding that the picketing was designed to create pressures that would cause the subcontractors to stop the work on their subcontracts with the Insurance Company, as well as to compel the Insurance Company to recognize one of the respondents as the bargaining agent of its employees. We think that conclusion must follow, when consideration is given to the pressure that had theretofore been directed at the secondary employers, the purpose of which plainly was to induce them to cease doing business with the primary employer and thus compel the latter to unionize its employees and recognize the respondents as their bargaining agent.
 
 
 The 8(b) (2) Violations
 
 
 28
 Section 8(a) (3) of the Act makes it an unfair labor practice for an employer by discrimination, in regard to hire or tenure of employment, or any term or condition of employment, to encourage or discourage membership in any labor organization, except insofar as permitted by a valid union-security agreement. By § 8(a) (3) (i) of the Act, the employer is forbidden to enter into a union shop contract with a labor organization, unless such labor organization "is the representative of the employees as provided in Section 9(a), in the appropriate collective-bargaining unit covered by such agreement when made". Neither of the respondents was the representative of the employees of the Insurance Company as provided in § 9(a) of the Act.
 
 
 29
 The question presented is whether the respondents, by demanding and using pressure to enforce their demands that only members of the Union be employed on the Insurance Company's project, attempted to cause the Insurance Company to discriminate against nonunion employees in violation of § 8(a) (3) of the Act, thereby violating § 8(b) (2) of the Act. The evidence established that the respondents repeatedly endeavored, both through direct and indirect pressures, to induce the Insurance Company to abandon its open shop policy and employ only members of the respondents, and that in the midst of such pressures the respondents urged the Insurance Company to sign a collective bargaining contract which was tantamount to a closed shop agreement and an illegal union-security agreement.
 
 
 30
 The respondents contend that their demands upon the Insurance Company would not have required the dismissal of any of its employees currently on the job. Certainly, the objective of the respondents was to compel the Insurance Company to cease employing nonunion men, including both its present and its future employees. But, if the demands of respondents went only so far as they contend, they would still have been a violation of § 8(b) (2) of the Act. That section proscribes union attempts to cause discrimination based on union membership, not only against specific employees, but also against potential employees. The "prohibition is not confined to those instances in which specific non-union employees are unlawfully discriminated against. It extends as well to instances in which the union, or its agents, seeks to cause the employer to accept conditions under which any non-union employee or job applicant will be unlawfully discriminated against."[7]
 
 
 31
 Accordingly, we conclude that the findings of the Board, on a consideration of the record as a whole, are supported by substantial evidence and afford a sound basis in law for its order.
 
 
 32
 The order will, therefore, be enforced.
 
 
 
 Notes:
 
 
 [1]
 Hereinafter called the Insurance Company
 
 
 [2]
 Hereafter called respondents
 
 
 [3]
 Hereinafter called the Act
 
 
 [4]
 N. L. R. B. v. United Brotherhood of Carpenters and Joiners, 10 Cir., 184 F. 2d 60, 64
 
 
 [5]
 International Brotherhood of Electrical Workers, Local 501 v. N. L. R. B., 2 Cir., 181 F.2d 34, 37
 
 
 [6]
 N. L. R. B. v. Denver Building & Construction Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284
 
 
 [7]
 N. L. R. B. v. National Maritime Union of America, 2 Cir., 175 F.2d 686, 689; N. L. R. B. v. George D. Auchter Co., 5 Cir., 209 F.2d 273, 276-277