**John A. PIEZONKI, d/b/a Stover Steel Service, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 6894.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 8, 1955.

Decided Feb. 26, 1955.

Sidney J. Barban and Earle K. Shawe, Baltimore, Md., for petitioner.

Norton J. Come, Atty., N.L.R.B., Washington, D. C. (David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Rosanna A. Blake, Atty. N.L.R.B., Washington, D. C., on brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is a petition to review and set aside a decision of the National Labor Relations Board denying relief to a subcontractor on a construction project on a complaint that certain activities engaged in by labor unions amounted to a violation of secondary boycott provisions of section 8(b) (4) (A) of the Labor

Management Relations Act. 29 U.S.C. A. § 158(b) (4) (A). The petitioner is John A. Piezonki, doing business as Stover Steel Service, who was one of the subcontractors on construction projects being carried on by Henry J. Knott, Inc., and the Garden Construction Company, an affiliated corporation, near Baltimore, Md. Knott and the Garden Construction Company were operating on an open shop basis. Petitioner and a number of other subcontractors on the projects were operating on the closed union shop basis. In an effort to force Knott and Garden to operate 100% union shop, the Baltimore Building and Construction Trades Council, an organization of labor unions, began an organizing campaign at the Claremont and Jessups projects of Knott and Garden and placed a picket line around the projects which the union employees of the union subcontractors refused to cross. Petitioner contends that the object of this picket line was to bring pressure on Knott and Garden to unionize their business by means of the pressure exerted on the subcontractors as a result of the stoppage of work by their employees. The trial examiner found the facts in accordance with this contention and recommended that petitioner be granted the relief prayed. The board refused to grant it, however, on the ground that the effect of the picketing on the union subcontractors was to be regarded as merely incidental to the organizing campaign conducted against Knott and Garden.

There is practically no dispute as to the facts, which are correctly summarized in the reports of the trial examiner and the board, and which may be stated briefly as follows: The Baltimore Builders Chapter of the Associated General Contractors of America, composed of contractors committed to the employment of union labor, had been urging the Trades Council, representing labor unions in the construction field, to organize the businesses of the non-union or open shop contractors in the Baltimore area; and early in 1953 the council decided to undertake the organization of Knott and Garden, who were constructing the Claremont and Jessups projects. An organizing campaign was accordingly commenced and a picket line was thrown around these projects, the pickets appearing at the time that the men went to work and bearing signs giving notice that the job was being picketed for purposes of organization. No notice was given that the picketing related only to Knott or Garden or that it was not directed towards union subcontractors.[1] The result was that, while the non-union employees of Knott and Garden and of non-union subcontractors paid no attention to the picket line, the employees of the union subcontractors, who constituted a substantial number of those working on the projects, refused to cross it. When they sought advice from their unions with regard to the matter, they either received no advice at all or such advice as caused them to refuse to work on the project so long as the picket line was maintained.[2] This was, of course, the result which was aimed at in establishing the picket line, for everyone knew that the union employees would not cross it and that their refusal to work thus brought about would result in pressure on the general contractors to yield to the demands of the unions. The matter was well put in the concluding findings of the trial examiner, wherein he said:

"The record shows that the Council had long been engaged in a campaign directed at the nonunion general contractors in the Baltimore area (including Knott and Garden) to require them to employ members

---

1. For Labor Board cases holding that somewhat similar signs were not sufficient to inform employees as to the limitation of the dispute, see Brotherhood of Porters, A.F.L. etc., 109 N.L.R.B. No. 166, and Chauffeurs, Teamsters, Warehousemen, etc., 106 N.L.R.B. No. 111.

2. For cases dealing with somewhat similar replies to questions as to crossing picket lines, see International Brotherhood of Boilermakers, etc., 95 N.L.R.B. 1191, and Glaziers Union Local No. 27, 99 N.L. R.B. 1391.

of its affiliated building crafts unions. The Council's tactics included both purely persuasive efforts (e. g., the conferences between Ellis and Knott) and attempts to force the general contractors to capitulate by depriving them of the services, i. e., business, of union subcontractors by causing the removal of the latter's employees from the job.

"The object of the latter tactics was not only to force or require such subcontractors to cease doing business with the general contractors but in practical effect it *prevented* them from doing business on the job sites during the course of the dispute, since they were rendered helpless to proceed under their contracts in the absence of labor supplied by the crafts unions.

"The Council's minutes and the other evidence herein establish clearly that the activities which comprise the subject matter of this proceeding were only a part and a continuation of the Council's campaign to require open shop contractors to hire all their manpower through the Council's affiliated unions. Though the evidence shows that the Council set upon its new course of action with full awareness of the pitfalls and problems presented by the secondary boycott provisions of the Taft-Hartley Act, as interpreted by recent Supreme Court decisions, and that it sought, obtained, and acted upon the advice of counsel, yet its objectives remained as before. What was changed was the *quality* of the *means* it employed to attain them. I.B.E.W. case, supra.

"But the change in methods could not disguise the objects of the action which was sought to be induced. Plainly, those methods still envisioned *one* objective which was illegal, i. e., to force or require the union subcontractors, who were in no way involved in the dispute, to cease performance—indeed to pre-

vent performance—of their contractual obligations to the general contractors. Thus the subcontractors, helpless and impotent neutrals, became the chief victims of a dispute which they were powerless to resolve."

It is no answer to this to say that the campaign was an organizational campaign and that the picket signs so indicated. The picketing was done at premises where business of the subcontractors as well as business of the contractors was being carried on; and everyone knew that it would affect, not the non-union employees of the general contractors, but the union employees of the subcontractors, and it is idle to suggest that it was not engaged in for this purpose. As the object was to bring pressure on the general contractors by the pressure exerted on the subcontractors, through concerted action of their employees, we think that the conduct complained of is clearly an unfair labor practice within the meaning of section 8(b) (4) (A) of the Labor Management Relations Act, 29 U.S.C.A. § 158(b) (4) (A), which provides that it shall be an unfair labor practice for a labor organization,

"to engage in, or to induce or encourage the employees of any employer to engaged in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization".

Directly in point, we think, is the very recent case of N.L.R.B. v. Local Union 55, 10 Cir., 218 F.2d 226, 231. In that case, as here, a picket line was established at a construction site where construction was being carried on by a non-union insurance company, as general employer, and a number of union subcontractors; and there, as here, no notice was given that the picketing was not di-

rected at the union subcontractors, with the result that their employees refused to work on the job. In sustaining the board, which held such picketing to be an unfair labor practice, the court, speaking through Judge Phillips, said:

"Here, at the common situs, construction work was being carried on by the Insurance Company, the primary employer, and by certain subcontractors. The object of the picketing was to compel the Insurance Company to recognize one of the respondents as the bargaining agent for its employees and to cease working nonunion men alongside of union members. The picketing signs were not directed at the primary employer alone, but at the project, at which secondary employers were also working. It read: 'Working Conditions on This Job Unfair to Carpenters' District Council.' It is a reasonable inference from the evidence that a primary purpose of the picketing was to cause the employees of the subcontractors to cease working on the project and prevent the subcontractors from completing the construction under their subcontracts, as a means of compelling the Insurance Company to recognize one of the respondents as the bargaining agent for its employees and to cease working nonunion men on the project. That was the only way that the respondents could accomplish their objectives, so long as union employees of the subcontractors were willing to work on the project with nonunion employees of the Insurance Company and the nonunion employees of the Insurance Company were unwilling to recognize either of the respondents as their bargaining agent and to become members of the Union.

"We conclude that under the undisputed facts and the reasonable inferences deductible therefrom, which it was the peculiar province of the Board to determine, the Board was fully warranted in concluding that the picketing was designed to create pressures that would cause the subcontractors to stop the work on their subcontracts with the Insurance Company, as well as to compel the Insurance Company to recognize one of the respondents as the bargaining agent of its employees. We think that conclusion must follow, when consideration is given to the pressure that had theretofore been directed at the secondary employers, the purpose of which plainly was to induce them to cease doing business with the primary employer and thus compel the latter to unionize its employees and recognize the respondents as their bargaining agent."

Directly in point, also, is the decision of the Supreme Court in N.L.R.B. v. Denver Building Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284, although in that case the general contractor was a union employer and the picketing was engaged in because of the employment of nonunion men by a subcontractor. In holding the picketing there to be an unfair labor practice within the meaning of the section above quoted, the court held that the contractor and the subcontractor were to be held independent contractors doing business at the common site and that the picketing was to be judged accordingly. In point, also, is the decision of the Supreme Court in International Brotherhood of Electrical Workers v. N.L.R.B., 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299, in which picketing by labor unions was condemned as an unfair labor practice where the picketing took place at a construction project and the object was to force the general contractor to terminate a contract with a subcontractor who employed non-union labor. In the case last cited the pressure resulted from union employees of another subcontractor refusing to cross the picket line.

The board has recognized the difficulty of distinguishing between picketing which is proper, because directed at ob-

taining relief from the person picketed, and picketing which is improper because directed at one person with a view of creating pressure on another, where both are operating at the same work site; and in the Moore Drydock case, Sailors Union of the Pacific 92 N.L.R.B. 547, 549, the following were laid down as conditions which must be observed if the picketing is not to be condemned as unfair, viz.:

"(a) The picketing is strictly limited to times when the situs of dispute is located on the secondary employer's premises;

"(b) at the time of the picketing the primary employer is engaged in its normal business at the situs;

"(c) the picketing is limited to places reasonably close to the location of the situs; and

"(d) the picketing discloses clearly that the dispute is with the primary employer."

These conditions have been approved by the Court of Appeals of the 10th Circuit in N.L.R.B. v. Local Union 55, supra, by the Court of Appeals of the 7th Circuit in N.L.R.B. v. Chauffeurs, Teamsters, etc., 7 Cir., 212 F.2d 216, 219, and by the Court of Appeals of the 2d Circuit in N.L.R.B. v. Service Trade Chauffeurs, etc., 2 Cir., 191 F.2d 65, 68. The fourth condition was clearly violated here, as the picketing did not disclose clearly that the dispute was with the primary employer, the general contractor. It resulted and was manifestly intended to result in interfering with the employees of the union subcontractors, who, so far as the evidence shows, were the only ones affected by it.

This is not a case like N.L.R.B. v. Rice Milling Co., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277, where the picketing was directed solely at the manufacturing company whose plant was picketed and where interference by the picket line with trucks attempting to make deliveries to the plant was incidental to the primary picketing. Here the main purpose as well as the effect of the picketing was to drive the employees of the union

subcontractors from the job. This was clearly engaging in a secondary boycott within the prohibition of the statute, and the consequences thereof may not be avoided by reason of the fact that the ultimate purpose was to organize the workers of the general contractors at the work sites where the picketing was carried on.

For the reasons stated, the order of the board will be set aside and the cause will be remanded for proceedings in conformity with this opinion.

Order set aside and cause remanded to board.