**SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, ATLANTIC & GULF DISTRICT, HARBOR AND IN-LAND WATERWAYS DIVISION, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 14373.**

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 4, 1958.

Decided Jan. 29, 1959.

Mr. C. Paul Barker, New Orleans, La., of the bar of the Supreme Court of Louisiana, pro hac vice, by special leave of court, with whom Messrs. Ray R. Murdock, Washington, D. C., and Seymour W. Miller, Brooklyn, N. Y., were on the brief, for petitioner.

Mr. Norton J. Come, Deputy Asst. Gen. Counsel, with whom Mr. Jerome D. Fenton, Gen. Counsel, Mr. Thomas J. McDermott, Assoc. Gen. Counsel, and Mr. Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., were on the brief, for respondent.

Messrs. Joseph H. Sperry and John E. Bailey, Houston, Tex., filed a brief on behalf of Gulf Oil Corp. as amicus curiae, urging enforcement of the order of the Board.

Before PRETTYMAN, Chief Judge, and EDGERTON and DANAHER, Circuit Judges.

PRETTYMAN, Chief Judge.

This case is before us upon a petition to review and set aside an order of the National Labor Relations Board and upon a cross-petition by the Board for enforcement of its order. The Board held certain picketing by a union to be illegal.[1]

The parties involved in the controversy are Salt Dome (Salt Dome Production Company), Gulf (Gulf Refining Company), Todd (Todd Shipyards, Inc.), and the Union (Seafarers International Union, Atlantic and Gulf District, Harbor and Inland Waterways Division, AFL-CIO). Salt Dome is an oil-drilling operator which works offshore in the Louisiana tidelands in the Gulf of Mexico. Gulf is an oil-refining company. Salt Dome works under a contract with Gulf, among others, and, pertinent to the present litigation, leased a boat from Gulf. Todd is a ship-repair company in New Orleans.

The boat leased by Salt Dome from Gulf and used by Salt Dome in its offshore drilling was the Pelican, a fully-manned ocean-going motor vessel. The personnel aboard were in four categories, (1) licensed deck officers and engineers, (2) a drilling crew, (3) an unlicensed steward department operated by an independent contractor, and (4) an unlicensed deck and engine crew. The latter are the employees involved in this controversy.

Prior to the events with which we are concerned, the Pelican had been offshore for more than a year. Her crew worked in shifts, of course, and the shifts by groups worked on a ten-day-aboard and five-day-off schedule. Transportation to and from the vessel was normally furnished by an independent helicopter service, based on a heliport at Leeville, Louisiana.

During the spring and summer of 1956 the Union engaged in a campaign to organize the unlicensed employees of Salt Dome. It filed but later withdrew a petition to be certified as bargaining representative for this personnel.

On December 2, 1956, Salt Dome, pursuant to orders from Gulf, moved the

1. In violation of Sec. 8(b) (4) (A) and (B) of the Act, 61 Stat. 140–141 (1947), 29 U. S.C.A. § 158(b) (4) (A) and (B).

Pelican into the Todd shipyard for overhaul and repairs. On December 5th a majority of the unlicensed personnel aboard the Pelican struck, left the ship, and began to picket on the wharf immediately alongside. Upon protest by Todd against picketing on its property, the Union moved the pickets to the outside and front of the shipyard gates. The picketing was at all times peaceful. The pickets carried two signs, which read, respectively:

> "Read Our Leaflet
> Organizational Picket
> Employees of
> Salt Dome Production Co.
> Aboard
> M/V Pelican
> Join Our Union
> for Better Wages, Hours and Conditions
> Seafarers' International Union, AFL-CIO
> Read our Leaflet
>
> No Dispute with Todd Shipyard"
> "Read Our Leaflet

---

> PICKET
> SALT DOME PRODUCTION CO.
> UNFAIR
> Employees on
> M/V PELICAN
> ON STRIKE

---

> Seafarers International Union—
> AFL-CIO
> READ OUR LEAFLET
> No Dispute With Todd Shipyard"

The pickets also distributed two leaflets, one of which read:

> "This picket sign is directed at the employees of Salt Dome Production Company working aboard the Motor Vessel Pelican. We placed pickets within these premises and adjacent to the Motor Vessel Pelican where Salt Dome Production Company employees are now working. We were then requested to move our pickets. If we are ever permitted to return our pickets and place them right adjacent to the actual operation of Salt Dome Production Company aboard the Motor Vessel Pelican within these premises, we will do so. In the meantime, please consider this picket line as if it were only adjacent to the Motor Vessel Pelican aboard which Salt Dome Production Company is engaged in these premises.

> "Our dispute is with Salt Dome Production Company and not with Todd Shipyards Corporation or any other employer working within this premise or area."

The other leaflet recited the advantages which the Union claimed it could achieve, and closed with:

> "(The information contained in this leaflet is only for the employees or prospective employees of Salt Dome Production Company)."

Todd's employees refused to work on the Pelican but otherwise continued their normal activities about the yard. The Pelican's drilling crews, supervisors, steward department, and a part of the marine crews, i. e., the non-striking part, continued to work aboard the vessel. On the afternoon of December 7th Salt Dome removed all employees, with the exception of the supervisors, from the Pelican. On December 15th the United States District Court enjoined all picketing in this dispute. After dark on the evening of December 18th the Pelican was towed from dry dock to an anchorage on the Mississippi River, outfitted with the necessary crews, consisting partly of old and partly of new employees, and during the night sailed away.

Todd charged the Union with an unfair labor practice in its picketing, and a complaint was issued by the General Counsel of the Labor Board. After full and regular proceedings the Board, one member dissenting, held that the picketing after all employees (except the supervisors) had left the Pelican was in

violation of Section 8(b) (4) (A) and (B) of the statute.[2]

The Board found that this picketing was designed to, and did, induce the Todd employees to refuse to work on the Pelican, in order to force Todd to cease doing business with Salt Dome and Gulf and to require Salt Dome to recognize the Union notwithstanding its lack of certification as bargaining representative.

The outcome of the controversy depends upon the disposition of three or four subsidiary disputes. The first question is whether Salt Dome was engaged in its normal business when it had the Pelican undergoing repair at the Todd yard. In the Moore Dry Dock case [3] the Board laid down certain criteria for determining whether a union violates the statute when it pickets on or at the premises of an employer not in the labor dispute—called, in the jargon of this field of the law, a secondary employer or a neutral employer. That decision and opinion seem to have been approved by several Courts of Appeals,[4] including this court.[5] It seems to be agreed in the case now before us that all the criteria for legal picketing set forth in the Moore Dry Dock case were met, with one exception; dispute revolves around that one. This disputed standard is that the primary employer must be about his normal business at the situs of the picketing.

To us it seems indubitably clear that Salt Dome was engaged in normal business in overhauling and repairing the Pelican. In this mechanical age overhaul and repair are as normal and as necessary as any phase of an operation involving machinery. Engines of all sorts—trucks, newspaper presses, jets, locomotives, etc., etc.—must periodically be overhauled and repaired. So much is so clear that it need not be belabored.

But the argument is that Salt Dome was not doing the overhaul and repair; the Pelican after December 7th was a "dead vessel", and even before that date work was being done by Todd; Salt Dome was not engaged in any business, normal or otherwise, on the Pelican. The argument is clearly in error on the facts, in so far as the period prior to December 7th is concerned. Salt Dome had the Pelican in the Todd yard for an operation which had to be performed every year, and it had its employees aboard in connection with that operation. The picket line, then, when established was legal. So the question is

2. Supra note 1, reading as follows:
   "(b) It shall be an unfair labor practice for a labor organization or its agents—
   ❊   *   *   *   *
   "(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; (B) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9; * * *."

3. Sailors' Union of the Pacific, 92 N.L.R.B. 547 (1950).

4. NLRB v. Associated Musicians, 226 F. 2d 900 (2d Cir., 1955), certiorari denied 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483 (1956); NLRB v. Service Trade Chauffeurs, etc., 191 F.2d 65 (2d Cir., 1951); Piezonki v. NLRB, 219 F.2d 879 (4th Cir., 1955); NLRB v. General Drivers, etc., 225 F.2d 205 (5th Cir., 1955), certiorari denied 350 U.S. 914, 76 S.Ct. 198, 100 L.Ed. 801 (1955); NLRB v. Chauffeurs, Teamsters, etc., 212 F.2d 216 (7th Cir., 1954); Local 618, etc. v. NLRB, 249 F.2d 332 (8th Cir., 1957); NLRB v. Local Union No. 55, 218 F.2d 226 (10th Cir., 1954).

5. Sales Drivers, etc. v. NLRB, 97 U.S. App.D.C. 173, 229 F.2d 514 (1955), certiorari denied 351 U.S. 972, 76 S.Ct. 1025, 100 L.Ed. 1490 (1956).

whether an employer can transform a picket line from a legal one to an illegal one merely by moving his non-supervisory employees away. We think he cannot.

We do not intend here to make a ruling broader than the case before us. This boat, a piece of equipment owned by the primary employer, was actually the situs of the primary dispute. The primary situs in the dispute was movable and did move normally from place to place. Moreover there was not, as we shall see in a moment, another permanent place of business of Salt Dome which could effectively be picketed. We think that, when an employer under such circumstances moves such a piece of equipment onto the property of someone else, for a normal business purpose, striking employees may peaceably picket that equipment even though none but supervisory employees are on or about it. Several propositions support this conclusion. The chief one is that employees should not be held to lose the right to picket peaceably if all employees go out on the strike so that none are left on the employer's property. Another supporting proposition is that the primary employer should not have the power to prevent picketing by merely turning out all his employees. We think the presence or absence of employees of the primary employer on the premises is not a critical factor in the legality of a picket line.

On this first question we conclude that the Pelican was at the Todd yard in the course of the normal business of its lessee-operator, Salt Dome.

The second critical consideration is whether the Union induced or encouraged the employees of Todd to refuse to work on the Pelican, with the object of forcing Todd to cease doing business with Salt Dome. The determining factor is the objective, the intendment, of the strike.[6] The statute forbids a strike if an object of the strike is to induce a person not the primary employer or an employee of his to take some action such as ceasing to do business with the primary employer. The cases recognize the very practical fact that, intended or not, sought for or not, aimed for or not, employees of neutral employers do take action sympathetic with strikers and do put pressure on their own employers. The Supreme Court has described all this and delineated the rules in the series of cases we have cited. The question is the objective. In the case at bar, if the objective of the strike encompassed Salt Dome only, it was legal. If its objective was partly Todd or its employees, it was illegal. The difference is in whether the effect on Todd's workers was an objective of the strike or was merely an incident of it. The line is fine, but we think the Board erred in some aspects of its consideration and these errors led to an erroneous conclusion on the point.

To understand the problem it is necessary to discern the meaning of Section 8(b) (4), which, in turn, requires an understanding of the evil against which it was directed. The section has frequently been called by the courts and by Congress "the secondary boycott section". A union engages in a secondary boycott when it treats one who supplies, services, or buys from an employer with whom it has a labor dispute, as though the dispute were with the supplier, servicer or customer. It urges the customers, suppliers and servicers of the neutral employer to refrain from doing business with him and his employees to cease working for him. One of the most effective methods of doing this is to picket the neutral place of business, relying on the union man's traditional strong aversion to crossing a picket line.

6. NLRB v. International Rice Milling Co., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277 (1951) ; NLRB v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951) ; International Brotherhood of Electrical Workers, etc. v. NLRB, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951) ; Local 74, United Brotherhood of Carpenters, etc. v. NLRB, 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 1309 (1951).

In proportion to the extent and success of the picketing, the "neutral" or "secondary" employer, with whom the union has no labor dispute, is cut off from the business world, because his own employees and the employees of his customers, suppliers and servicers will not cross the line. All this happens because he is doing business with the employer with whom the union has the dispute, the "primary employer". In order to protect unoffending employers from this extraordinary pressure, Congress, in Section 8(b) (4), made this tactic an unfair labor practice.

The words of this section of the Act, read literally, seem to proscribe peaceful picketing at the primary employer's premises. It is clear that, when a union pickets an employer with whom it has a dispute, it hopes, even if it does not intend, that all persons will honor the picket line, and that hope encompasses the employees of neutral employers who may in the course of their employment (deliverymen and the like) have to enter the premises. Thus some of the business relations between the two employers would automatically cease. The union knows this will be the result if, as it hopes, its picket line at the premises of the primary employer is honored. Moreover the neutral employer who is a servicer or supplier of the primary employer is under greater or less economic pressure to end all business relations with the primary employer.

■■ But it is clear from the rest of the Act, especially from Section 13,[7] that Congress did not intend to forbid picketing at a primary employer's premises, the situs of the dispute. Section 8(b) (4) must be interpreted and not merely read literally.[8] No matter how great the pressure on a neutral employer may be when somebody else's place of business is picketed, it is essentially different from the pressure such a neutral feels when his own business is being picketed. This difference in pressure, between that which occurs, somewhat indirectly, when another employer's premises are picketed and that which occurs when a neutral employer's own premises are picketed, is the rationale which must govern the interpretation of Section 8(b) (4).

■ In this case Todd was under economic pressure, because one of its drydocks was unusable and it could not go forward with one piece of business. But this pressure was the same sort as that felt by an employer when one of his major suppliers or customers is being picketed, or that which a contractor feels when a subcontractor is struck at a crucial point in construction. It was quite different from the kind of pressure Todd would have felt had the Union not made clear it had no dispute with Todd. The mere fact that Todd felt some pressure from the picketing of the Pelican is not dispositive of the problem under Section 8(b) (4). The critical consideration is that the pressure thus put upon Todd was not different from that felt by servicers or suppliers under the most ordinary circumstances when a customer of theirs is picketed.

The question which remains is: Did the Union intend a more direct effect on Todd? The statute makes the "object thereof" the critical factor. Did the Union intend to place a boycott on Salt Dome alone, with only an incidental economic effect on Todd and Gulf, or did it intend to place a boycott on Todd and Gulf along with Salt Dome?

In the absence of admissions by the union of an illegal intent, the nature of acts performed shows the intent. All the concrete evidence negatives an objective on the part of the Seafarers Union to force or require Todd to do anything. The statements in the signs and leaflets, which we have quoted, are clear and unequivocal. Todd employees were represented by another union; there is no evidence that the Seafarers made any

7. 61 Stat. 151 (1947), 29 U.S.C.A. § 163.

8. Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892); United States v. Kirby, 7 Wall. 482, 74 U.S. 482, 19 L.Ed. 278 (1869).

contact whatever with that union. No Todd employee was approached except for the distribution of the leaflets. Todd's employees came and went about their usual business, except only for work on the Pelican. Todd was not shut down; the Pelican was shut down. The picketing was as close as possible to the situs of the dispute. Had Todd not objected to picketing on its property, the pickets would not have been at its front gate. We do not view the acts of the Union as evidencing an objective to affect Todd any more than any picket line might affect a servicer or supplier of the picketed employer.

Certain witnesses testified the Union "hoped", or "had a hope", that Todd employees would support it in its strike. The Board put considerable reliance on that testimony. But hope and objective cannot be equated. Unions, like many other organizations, may hope for many things without making those things objects of their programs. Men have many hopes which are not objectives of action. If the statutory clauses here involved were to be interpreted as forbidding any strike in which a labor organization hoped that another employer would cease doing business with the primary employer, almost all strikes would be outlawed; we would suppose that almost all strikers hope other employees will support them, with the natural results of such support.

We are not impressed by the Board's suggestion, mentioned in a footnote in its brief here, that the Union might have placed its picket line at the heliport in Leeville. The trial examiner found that the primary situs of the dispute was the Pelican, and we do not understand the Board to question that finding. We agree with the finding and think the heliport could hardly be deemed a more proper location for picketing. It was the place whence and thither the men took trans-portation to and from work. It is not unlike a bus depot. None of the crews worked there. Salt Dome has only an office there, located on a dock owned by Gulf. Approaches are by a roadway built up over marshland. In any event, in a later footnote to its brief, the Board explicitly says its "decision here does not turn on the availability of another place to picket".

Sometimes this problem is cast in terms of the relative weights of the interest of the neutral employer in his business and the interest of the picketing employees in their strike. The statute is an expression of "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." [9] Here Todd, the unoffending employer, bore no more adverse effects than it would have suffered had it been working on the Pelican at a dock owned by Salt Dome several miles away and had the picketing been at that dock. If such had been the case, Todd's employees would have refused to cross the line in order to work on the Pelican or to work on machinery brought to Todd's shops from the Pelican, a "hot" ship. Such picketing would undoubtedly have been legal. Since the picketing in the case at bar cast upon Todd no greater adverse effect than would thus have been the case, its interest in preventing the picketing was not as great as the employees' interest in picketing what was the situs of the dispute. There is no reason in this case to fail to preserve "the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes".

The order of the Board will be set aside.

So ordered.

9. NLRB v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).