John A. **PENELLO**, Regional Director of the Fifth Region of the National Labor Relations Board for and on behalf of the National Labor Relations Board, Petitioner,

v.

**WILMINGTON BUILDING AND CONSTRUCTION TRADES COUNCIL, AFL–CIO, Respondent.**

No. 2118.

United States District Court
D. Delaware.

Sept. 9, 1959.

Charles B. Slaughter, Washington, D. C., for N. L. R. B.

Joseph Donald Craven, Wilmington, Del., for respondent.

Courtney H. Cummings, Jr. (of Killoran & Van Brunt), Wilmington, Del., for James H. Wood, the charging party.

WRIGHT, Chief Judge.

This matter is before the court on a petition filed on behalf of the National Labor Relations Board (Board), by John A. Penello, Regional Director of the Fifth Region pursuant to Section 10(*l*) of the National Labor Relations Act (Act), as amended.[1] The petition, initiated after preliminary investigation of a charge filed by James H. Wood (Wood) charges that respondent, the Wilmington Building and Construction Trades Council, AFL–CIO (Council), an unincorporated association, has engaged in and is engaging in activities proscribed by Section 8(b) (4) (A) of the Act.[2] Respondent is a labor organization within Section 2(5), 8(b) and 10(*l*) of the Act,[3] and has its principal office and is engaged within this judicial district in transacting business of its members.

Wood, a sole proprietor, is engaged as a non-union general contractor in the building and construction industry in the State of Delaware with principal activity in the Dover area.[4] In connection

---

1. 29 U.S.C.A. § 160(*l*).
2. 29 U.S.C.A. § 158(b) (4) (A).
3. 29 U.S.C.A. §§ 152(5), 158(b), 160(*l*).
4. N.T. 34.

with this business Wood makes substantial purchases of materials from out of state suppliers.[5]

At the present time and prior to June 1, 1959 Wood has been engaged in certain construction work at Wesley College (Wesley), Delaware State College (State College) and William Henry High School (High School) each of which is located in the vicinity of Dover, Delaware.[6] A portion of the work to be performed at these sites has been let by Wood to subcontractors, some of whom operate "open shops".[7] The remainder only employ union personnel.[8]

The Council, as its name implies, is an association of building and construction trades unions and is affiliated with the Building and Construction Trades Department of AFL–CIO.[9] The Council is composed only of delegates from its member unions and its executive and organizing committees are composed of the business representatives of the constituent unions.[10] Thus, it has no member among employees as such, nor does it keep such membership for itself. To the extent the Council engages in organizational activities, or acts in the interests of employees, it does so on behalf of the building craft unions which compose it.[11]

During 1959 Council embarked on a campaign to organize the unorganized employees on various construction projects in the State of Delaware.[12] The three Wood projects mentioned above were among those selected as the object of the Council's endeavors.[13] Picketing commenced on the Wesley project around June 16 and on State College and High School during July.[14] The sign carried by the pickets bore the following legend:[15]

"Attention
Construction Workers
Join Your Appropriate
Craft Union
Improve Your Standard
of Living
See Your Pickets for
Authorization Cards
Wilmington Building Trades Council
AFL–CIO"

It is conceded that the picketing was at all times peaceful.[16]

The Regional Director asserts that the facts adduced at the hearing plainly warrant the belief that respondent had as an object of its activities to induce and encourage employees of Wood's subcontractors, their suppliers and deliverymen, to engage in strikes or concerted refusals in the course of their employment to use, manufacture, process, transport or otherwise handle or work on goods, articles, materials or commodities or to perform services, the purpose being to force or require the subcontractors, their suppliers and deliverymen to cease doing business with Wood and that equitable relief pending Board action is indicated.

The applicable statutory provisions are:

"Section 10(*l*). Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (A), (B), or (C) of section 8(b), the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional

---

5. N.T. 35.

6. N.T. 35.

7. N.T. 40.

8. N.T. 40.

9. RX 1; N.T. 18.

10. RX 1; N.T. 24–25.

11. RX 1.

12. N.T. 21–22.

13. N.T. 21.

14. N.T. 38, 58, 66.

15. PX 2.

16. N.T. 263.

attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: * * * Upon filing of any such petition the courts shall cause notice thereof to be served upon any person involved in the charge and such person, including the charging party, shall be given an opportunity to appear by counsel and present any relevant testimony: *Provided further*, That for the purposes of this subsection district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in promoting or protecting the interests of employee members. * * * " [17]

\* \* \* \* \* \*

"8(b) It shall be an unfair labor practice for a labor organization or its agents—* * *

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is:

"(A) forcing or requiring * * any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; * * * " [18]

■ Under Section 10(*l*) [19] the court's function is limited to determine whether there is reasonable cause to believe a violation of the Act as charged has been committed and the equitable relief sought is appropriate and proper.[20]

The evidence discloses that since the picketing commenced there has been a substantial breakdown in operations at the three sites, and that completion dates of the contracted work as a direct consequence of the picketing have been considerably delayed.[21] Employees of union subcontractors with but few exceptions

---

17. 29 U.S.C.A. § 160(*l*).

18. 29 U.S.C.A. § 158(b) (4) (A).

19. Note 17, supra.

20. "It is to be observed that section 10 (*l*), under which the issuing of a preliminary injunction is authorized, requires the district judge to find that there is reasonable cause to believe that a violation of the act as charged has been committed. Our review, therefore, is simply to determine whether the finding of a reasonable cause is not clearly erroneous under 52(a), Fed.Rules Civ. Proc. 28 U.S.C., and whether the form of relief granted shows a proper exercise of judicial discretion. This puts a lighter burden on both the district judge and ourselves than if final findings of ultimate fact were required. That task is, of course, for the labor relations board subject to review by this Court if and when enforcement is sought here." Schauffler v. Highway Truck Drivers & Helpers, 3 Cir., 1956, 230 F.2d 7, 9; Shore, for and on Behalf of N. L. R. B. v. Building & Construction Trades Council, 3 Cir., 1949, 173 F.2d 678, 8 A.L.R.2d 731; Douds v. Milk Drivers and Dairy Employees Union, 2 Cir., 1957, 248 F.2d 534; Douds v. Confectionery and Tobacco Jobbers Employees Union, D.C.S.D.N.Y.1949, 85 F.Supp. 191; Douds v. Local 294, D.C. N.D.N.Y.1947, 75 F.Supp. 414.

21. N.T. 70.

have refused to cross the picket line.[22] Deliveries of materials at the project sites to both union and non-union subcontractors and to Wood have been almost nonexistent since the commencement of the Council's activities.[23] In every instance, the stoppage is traced to the picketing.[24]

Where information concerning the nature of the dispute was sought by a union member from the business agent of his local, the explanation received did not accurately depict the purpose of the picketing and as a consequence, he refused to perform so long as the picket line was maintained.[25] The testimony of Joseph Komoroski, an employee of the Standard Bitulithic Company is particularly revealing on this point:[26]

"Q. Subsequent to July 7 did you have any further conversations with Mr. McBride? A. What does 'subsequent' mean, after it?

"Q. Yes, after July 7, do you recall? A. Yes; I called him the Thursday after that and asked him if there was any progress made, and he said he didn't know because he had been up state, he hadn't been down.

"Q. What else did he say? A. Well, I give him the reason why I called.

"Q. Why was that? A. We had to lay off about four or five men if they weren't going to start up again. And he said, 'That is the way things go.'

"The Court: Now, wait a minute.

"By the Court:

"Q. You said you had to lay off four or five men? A. Our company would have had to lay off four or five men.

"Q. Why? The strike wasn't against Standard Bitulithic, was it? A. No, no.

"Q. Why was that then? A. At that present time we just didn't

22. N.T. 42–44, 53–57, 59, 89, 104–105, 117, 133, 140, 146–148, 150, 176.

23. N.T. 156, 157, 167–168, 169, 174–175, 177.

24. N.T. 157, 167, 170–171.

25. N.T. 102–103, 106. The testimony of Raymond McBride, business representative of Local 542, Operating Engineers, and member of the Council portrays graphically the attitude of union leadership:
Questions by court:
"Q. I would just like to ask you this question: Are any instructions given to union members generally that they are not to cross the picket line, or is it an unwritten law among unions that they are not to cross picket lines? A. That is an unwritten law. I have not instructed no one not to cross a picket line, never.
"Q. I understand that. What is the result? What happens when you place pickets for the purpose of organization at a particular locality? What is the ultimate result? A. Well, the result of the line—the purpose of the line is to organize the unorganized craftsmen that are working on that project.
"Q. Well, as a union business agent what do you anticipate? A. Let me put

it this way: When I was working as a craftsman, as a journeyman, if I seen a picket line up, I sure would not cross that line.
"Q. That is right. A. I didn't have to be told, I didn't ask no questions. I just wouldn't cross it because I was out there fighting for a good cause. So I thought if I could help organize the unorganized workers—
"Q. So that as matters stand now, when a picket line is formed for any purpose, members of unions will not cross that picket line? A. Members of the unions do cross that picket line.
"Q. They do? A. I am talking as an individual member of a union, not for the—
"Q. I am talking about members of the union. Do they cross the picket lines? A. They do, yes. We have members that have crossed picket lines.
"Q. Well, do they cross it with the authorization of the union? A. They will probably ask the business agent, should they or shouldn't they. The business agent says, 'I can't tell you not to or I can't tell you to. You carry a union book and it is up to you as an individual union member. Draw your own decision there.' " (N.T. 237–238).

26. N.T. 102–103.

have really enough work to keep them going.

"Q. Wasn't there work at the plant of the job in Dover? A. Yes, sir.

"Q. What was the reason then you had to lay them off? A. Well, just because we wouldn't go in there and run that machinery.

"Q. You wouldn't go in there and run the machinery? A. No.

"Q. Why wouldn't you? A. Well, I thought it was common knowledge we weren't supposed to cross a picket line. Nobody told us not to.

"Q. I was going to ask you that. Did anybody tell you not to cross? A. No, sir, they never told me to or not to.

"Q. When you say it is common knowledge, you mean that is understood among Union men? A. Well, I guess you can put it that way. My father has been in the Union and he always talked that way and I guess it growed on me."

The message printed on the sign although purportedly addressed to the object of the Council did not designate the employer or employees it was designed to reach.[27] This type of sign where both primary and neutral employers occupy the same job situs has been declared unacceptable and when attended by equivocal explanatory advice of responsible union personnel has been held violative of Section 8(b) (4) (A).[28]

Further substantiation of petitioner's charge is demonstrated by the nonexistence of traditional organizational activities.[29] For instance, there was no attempt to meet with the unorganized working force; nor was any literature distributed explaining the virtues of union membership.[30] The picketing was sporadic; on several days no pickets appeared and on certain occasions when they did appear they did not remain on the site for the entire working day.[31] In fact, the only evidence of organizing activity, in addition to the picket sign, was the testimony of one business agent that he dispensed a few authorization cards and observed other pickets doing the same,[32] and that each picket was handed written instructions concerning his conduct while carrying the sign.[33]

In this posture the record parallels the factual context presented in Piezonki v. National Labor Relations Board, 4 Cir., 1955, 219 F.2d 879, where the Fourth Circuit in reversing a Board ruling held the union guilty of an unfair labor practice.[34]

27. PX 2.

28. " * * * The fourth condition was clearly violated here, as the picketing did not disclose clearly that the dispute was with the primary employer, the general contractor. It resulted and was manifestly intended to result in interfering with the employees of the union subcontractors, who, so far as the evidence shows, were the only ones affected by it." Piezonki v. National Labor Relations Board, 4 Cir., 1955, 219 F.2d 879, 883.

29. N.L.R.B. v. Knitgoods Workers' Union, Local 155, 2 Cir., 1959, 267 F.2d 916, 919–920.

30. N.T. 86, 155.

31. N.T. 47, 74–75, 86, 152, 154.

32. N.T. 235–236; RX 3.

33. N.T. 233–234; RX 2.

34. To appreciate fully the similarity of the two cases see findings of the trial examiner 108 N.L.R.B. 1575, 1577.

Piezonki differs in two main respects from the immediate action, neither of which is deemed significant. First, in Piezonki the Regional Director proceeded on a charge commenced by a union subcontractor; here the non-union general contractor filed the charge forming the basis of the petition. That Council's conduct also affected the union subcontractors drastically is demonstrated by the testimony of Leon Wilkins, plumbing and heating contractor:

"Q. Did you contact any business agents of any union prior to bidding on the job down there? A. Local 26.

"Q. What was the purpose of contacting them? A. Well, none of us like any labor trouble, so I contacted them to see if there would be any trouble

Special reference is directed to Judge Parker's lucid opinion wherein he discusses the objectives and consequences of this type of conduct:

"No notice was given that the picketing related only to Knott or Garden or that it was not directed towards union subcontractors. The result was that, while the non-union employees of Knott and Garden and of non-union subcontractors paid no attention to the picket line, the employees of the union subcontractors, who constituted a substantial number of those working on the projects, refused to cross it. When they sought advice from their unions with regard to the matter, they either received no advice at all or such advice as caused them to refuse to work on the project so long as the picket line was maintained. This was, of course, the result which was aimed at in establishing the picket line, for everyone knew that the union employees would not cross it and that their refusal to work thus brought about would result in pressure on the general contractors to yield to the demands of the unions. The matter was well put in the concluding findings of the trial examiner, wherein he said: * * *

" 'But the change in methods could not disguise the objects of the action which was sought to be induced. Plainly, those methods still envisioned *one* objective which was illegal, i. e., to force or require the union subcontractors, who were in no way involved in the dispute, to cease performance—indeed to prevent performance—of their contractual obligations to the general contractors. Thus the subcontractors, helpless and impotent neutrals, became the chief victims of a dispute which they were powerless to resolve.'

"It is no answer to this to say that the campaign was an organizational campaign and that the picket signs so indicated. The picketing was done at premises where business of the subcontractors as well as business of the contractors was being carried on; and everyone knew that it would affect, not the nonunion employees of the general contractors, but the union employees of the subcontractors, and it is idle to suggest that it was not engaged in for this purpose. As the object was to bring pressure on the general contractors by the pressure exerted on the subcontractors, through concerted action of their employees, we think that the conduct complained of is clearly an unfair labor practice within the meaning of section 8(b)(4)(A) * * *." 35

The above quoted portions of Judge Parker's opinion describe precisely what has transpired in the instant action and

down there. They were working a union contractor with non-union generals.

"Q. And what did they tell you? A. Well, they seemed to be very well pleased with it, that we could go down and bid and compete against the local boys and get a job down there.

"Q. And you subsequently bid and were awarded that job? A. That is right.

"Q. Now, how many men did you have working there? A. Oh, at the most I have had about six at a time.

"Q. Are they working now? A. No.

"Q. Why not? A. Well, because they won't cross the picket line.

"Q. Have you made any efforts to rectify that situation so that your men can cross the picket line?" (N.T. 139–140).

\* \* \* \* \*

"A. Well, I talked to Gordon McLean of Local 26 and asked him what they were trying to do to me down there, that they were glad that I would go down a get the job and then they put a picket line on me and stop me from working, that it looked like they were glad I got the job so they could have somebody to strike against, to take effect." (N.T. 142)

Second, Piezonki reflects a substantive determination whereas the present inquiry merely seeks to determine whether reasonable cause exists.

35. 219 F.2d 879, 880, 881.

since the standard in a 10(*l*) proceeding requires much less than that necessitated by an ultimate finding,[36] the court concludes that petitioner has sustained its burden.

Respondent has shown that at the present time certain union men are performing on the school sites. The fact remains, there was a substantial breakdown in operations directly traceable to the concerted activity of Council. Inducement and encouragement are no less proscribed because not fully effective.[37]

■ In this disposition, the court is mindful of the constitutionally protected right of a union to engage in organizational activities, a lifeblood of trade unionism. So long as the conduct is directed against the primary employer it is permissible and cannot be enjoined, notwithstanding, that the effect of such activity results in employees of neutral employers refusing to cross the picket line and thus incidentally exerting pressure on the primary employer. Where, however, the activity is addressed beyond primary conduct to reach employees of secondary employers Section 8(b) (4) (A) is violated. It is, indeed, a difficult task to distinguish between permissible and nonpermissible action. The difficulty is heightened when the primary and secondary employers perform at a common situs. Neither management nor labor should be permitted to take advantage of this uncertainty; hence, an ad hoc determination culled from marshalling all relevant evidence is required in each instance.

An evaluation of the entire record leads the court to conclude that there is reasonable cause to believe that respondent has engaged in unfair labor practices within the meaning of 8(b) (4) (A) affecting commerce and that equitable sanctions are indicated. Three schools are directly affected by the activity under consideration, therefore the public has a vital interest in seeing that the facilities are available for educational purposes as promptly as possible.[38]

Accordingly, to preserve the issues for the orderly determination provided for in the Act, the respondent will be enjoined and restrained from the picketing activity as now constituted at the job sites in issue.

The foregoing opinion is adopted as the court's findings of fact and conclusions of law pursuant to F.R.Civ.P. 52 (a).

Let an appropriate order in conformity herewith be submitted.

36. Note 20, supra.

37. "It is also immaterial that a complete shutdown was not achieved, that not all of the union employees refused to work, and that those who did refuse nevertheless worked for their employers on jobs which were not involved in the dispute. Cf. Acousti Engineering Co., supra. Inducement and encouragement are not less proscribed because not fully effective; the interdiction of the statute certainly applies wherever two or more employees, acting concertedly in response to the inducement, refuse to perform services." Piezonki v. N.L.R.B., 108 N.L.R.B. 1575, 1586 (1954). See also N.L.R.B. v. Associated Musicians, 2 Cir., 1955, 226 F.2d 900.

38. Douds v. Wood, Wire and Metal Lathers International Ass'n, 3 Cir., 1957, 245 F.2d 223