**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**KNITGOODS WORKERS' UNION, LOCAL 155, INTERNATIONAL LADIES' GARMENT WORKERS' UNION, AFL-CIO, Respondent.**

Nos. 77–78, Docket 25102, 25111.

United States Court of Appeals Second Circuit.

Argued Dec. 11, 1958.

Decided June 16, 1959.

Melvin Pollack, Atty., National Labor Relations Board, Washington, D. C. (Jerome D. Fenton, Gen. Counsel, Thomas J. McDermott, Assoc. Gen. Counsel, Marcel Mallett-Prevost, Asst. Gen. Counsel, and Norton J. Come, Deputy Asst. Gen. Counsel, Washington, D. C., on the brief), for petitioner.

Marshall L. Rosenberg, New York City (Lieberman, Katz & Aronson, New York City, on the brief), for respondent.

Before CLARK, Chief Judge, and HINCKS and LUMBARD, Circuit Judges.

HINCKS, Circuit Judge.

In these two cases, the National Labor Relations Board seeks enforcement of its orders directing the respondent, Knitgoods Workers' Union, Local 155, International Ladies' Garment Workers' Union, AFL-CIO, to cease and desist from violating § 8(b) (4) (C) of the National Labor Relations Act, 29 U.S.C. A. § 158(b) (4)(C).[1] Both cases relate

---

1. "Sec. 8 * * *

"(b) It shall be an unfair labor practice for a labor organization or its agents— * * *

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: * * * (C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees * * *."

to continued union picketing of the premises of the two employers involved, after other unions had been certified by the Board as the collective bargaining representatives of the employees.

In No. 25102 (James Knitting Mills, Inc.), reported at 117 NLRB 1468, Local 155 has been attempting to penetrate the employer's Brooklyn plant for a number of years. In 1954, Local 1499, Retail Clerks International Association, AFL, was certified as the James employees' bargaining representative. After certification of Local 1499, Local 155 nonetheless picketed for immediate recognition, until ordered by the Board to cease and desist. This court granted enforcement. On May 28, 1956, Treitler, business agent of Local 155, called upon James Landro, president of James Knitting Mills, at the James plant. Treitler informed Landro that he had orders to "hand over" James to Local 155 when the existing contract expired. Pressure was brought upon Landro to recognize Local 155 immediately and to sign a contract. This pressure Landro resisted, maintaining that representation was a matter for his employees. Two similar conversations took place in the following weeks, one on June 7 and one on June 13: De-Leo by inducements and threats continued to urge Landro to sign, and Landro continued to resist. Meanwhile, on June 7 or 8, Production Service Employees Union, Local 710, U. I. U., filed with the Board a petition for certification. On June 18, it entered into a consent election agreement with James. And on the same day, Local 155 began its picketing of the James plant, as DeLeo had threatened.

In so far as the signs carried by the pickets indicate the nature of the picketing, the picketing was organizational. A number of incidents cast doubt upon this characterization, however. There was some evidence, accepted by the Examiner, that in the period between June 18 and July 10, deliveries by truckers to the

James plant were somewhat impeded. The picketing covered all entrances of the James plant, including that used only for deliveries. Picketing was continuous during the day, although employees were not generally entering or leaving except in the early morning and late afternoon. And the picketing continued during the week following July 2, although all James employees were on vacation. On June 29, an election was held, which Local 710 won by a wide margin; Local 155 had declined to participate. On July 10, Local 710 was certified by the Board as the collective bargaining representative. On July 12, one employee was approached by the pickets and asked to join the picket line. Picketing was continued,[2] apparently without further incident.

In No. 25111 (Packard Knitwear, Inc.), reported at 118 NLRB 577, there is no history of collective bargaining before the picketing began. The employer-corporation was first formed in February 1956; but no manufacturing activities were begun until May. In April, Local 155's representatives called upon the president of Packard. Although there was some dispute about the matter, the Examiner found, and the conclusion is not questioned here, that the union demanded that Packard sign an agreement with it. The president replied that he had no employees at that time, and that signing them up was the union's job. The following day, despite the fact that no employees were then working, Local 155 began to picket the Packard plant. The signs first read that Packard was struck; but upon protest, they were changed to the normal organizational picketing signs. Again, as in the James case, both freight and employees' entrances were covered. After manufacturing activities were commenced, the pickets patrolled the sidewalk all day, although employees were not entering or leaving. As a result of the picketing, a number of Packard's suppliers either discontinued delivery or changed their

2. A partial injunction, which did not forbid picketing, was issued by the District Court for the Eastern District of

New York, Douds v. Knit Goods Workers' Union, etc., 147 F.Supp. 345.

method of delivery. Some deliveries were made after working hours, when the picketing had ceased. Others were completed by the employer itself.

On September 11, 1956, a petition for representation was filed by an independent union; and on October 10, an election was held, in which Local 155 did not participate. The independent won, 34 to 2, and was certified by the Board on October 18, as the exclusive bargaining representative. Local 155's picketing, as well as the impact of that picketing on deliveries, continued unchanged.

In each case, the Board adopted the Examiner's findings and conclusions. In both, it held that Local 155's picketing activities were violative of § 8(b) (4) (C) of the Labor Relations Act. And in both it seeks enforcement of its cease and desist orders.

▮ It has long been recognized that picketing in labor disputes often contains elements both of persuasion and of coercion. In so far as picketing is free from coercive intent or effect, Congress has declared that it shall not be the basis for a finding of an unfair labor practice; and perhaps the declaration is necessary, if the Act is to avoid the First Amendment's imperative. 29 U.S.C.A. § 158(c); see International Brotherhood of Electrical Workers, Local 501, AFL v. N. L. R. B., 341 U.S. 694, 71 S.Ct. 954, 95 L. Ed. 1299. Nor is picketing unfair, under the Act, merely because it is shown to be coercive in effect; the tests set forth in the Act must be met. See Garner v. Teamsters, etc., 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228. To render the union's activities illegal under § 8(b) (4) (C), two elements must concur: the labor organization must be inducing employees to strike or to engage in a concerted refusal to work; and an object of the union's activities must be its recognition by the employer as the representative of its employees, where another union has been certified by the Board.

We had occasion to consider the evidence necessary to support these elements recently in N. L. R. B. v. Local 50, Bakery and Confectionery Workers International Union, AFL-CIO (Arnold Bakers), 2 Cir., 245 F.2d 542. In that case, we refused to grant enforcement of a Board order, because there was no substantial evidence to sustain the Board's finding that the picketing was designed to induce a work stoppage or that it was for an unlawful objective. There the evidence showed that before certification the union's picketing was aimed at propagandizing the employees and at gaining recognition from the employer; both objectives were, at that time, permitted by the statute. In light of this pre-certification evidence, we held unwarranted the Board's inference that the union's continuation of its picketing after the certification election was solely for the then illegal purpose of coercing recognition. Furthermore, we held that the mere existence of a picket line was not to be interpreted as a strike signal. In the absence of some evidence of inducement, we again felt that the Board was not warranted in presuming that picketing was for an illegal purpose.

Upon this appeal, the Board asks us to overrule the Arnold Bakers case. We think, however, that the cases now on appeal should be differentiated on their facts. In both James and Packard, the Board in effect found that the sole objective of Local 155 before certification was the coercion of the employer. In each case, demands were made upon the employer to force the union's recognition. In the James case, the demands were repeated several times. Although the picketing signs characterized the activity as organizational, we agree with the Board that little weight is to be given such symbols. Here the Board found, through uncontradicted testimony, that the union's demands upon James were unaccompanied by "any efforts to reach the employees through any of the ordinary methods traditionally resorted to * * * to organize workers." No circulars were distributed to the employees, no personal solicitation took place, there was no effort to reach them by mail. Moreover, the picketing covered entrances not used by employees; it continued

during hours when employees were not entering or leaving and during a week when no employees were in the building. And in Packard, the picketing began before there were any employees to be organized. There was convincing evidence that it was directed primarily at suppliers; there was again no evidence that the usual traditional methods were used to influence the employees. These patterns stand in sharp contrast to that we considered in Arnold Bakers. There, against the background of a long history of union attempts to organize, we refused to accept the Board's inference that post-certification picketing was directed at forcing employer recognition. Here, the only objective before certification for which there is substantial evidence is that of forcing recognition. Under these circumstances, we think the Board was justified in concluding that the objective persisted, even after certification had made it illegal. Indeed, we think any other conclusion would have been unrealistic.

We also think there was sufficient evidence from which the Board could infer that Local 155's activities were aimed at inducing a work stoppage. It is clear that the conclusion does not depend upon success or failure of the picket line, although success or failure is a relevant factor. N. L. R. B. v. Associated Musicians, 2 Cir., 226 F.2d 900, certiorari denied 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483. We adhere to our holding in Arnold Bakers, supra, that the mere fact of picketing does not raise any presumption about its natural and probable consequences. But in the James case there was evidence, accepted by the Examiner, that a direct effort to induce an employee to strike had taken place in at least one instance after certification (Postilio). Furthermore, there was evidence in both cases that the picketing caused some interference with deliveries and served to "encourage the employees," i. e., the truck drivers, "to engage in, * * * a concerted refusal in the course

of their employment to * * * transport * * * goods" [3] within the meaning of § 8(b) (4). And in both cases there was evidence of threats on the part of Local 155 to put the employers out of business,—an objective which if achieved would deprive the employees of their jobs. In the context of these cases it might reasonably be found that the maintenance of the picket line by Local 155 against premises where none of its members were employed was a demonstration of superior economic power intended to induce the employees by striking to add to the economic pressure on the employers and by this transfer of allegiance to Local 155 to earn whatever job security Local 155, as a member of a powerful international union, could give.

Viewed realistically, the effect of the union's activity in these cases was twofold: it harassed the employer directly, an object not forbidden by the Act; and it brought pressure upon the employees, not by the legitimate arts of persuasion but by making them fear the disappearance of their jobs, to strike and thus lend their weight also to punitive economic pressures against the employers. Such tactics are sharply at variance with the Congressional policy of allowing employees freedom to decide which union, if any, they will join, see § 7 of the National Labor Relations Act, 29 U.S.C.A. § 157; they are also at variance with the Congressional policy of providing stability to the bargaining process through certification, see 29 U.S.C.A. § 159(c) (3), especially when they take place immediately after certification of another union.

The absence of any legitimate organizational activity by Local 155 coupled with its pressure tactics, in the context of the evidence in these cases, we hold, provided adequate basis for the Board's conclusion that the picketing encouraged a work stoppage.

The enforcement of both orders is granted.

3. There was direct evidence of concerted action by the truck drivers in the Packard case and room for the inference of concerted action in the James case.