340 F.2d 71
 NEW POWER WIRE AND ELECTRIC CORP. and P & L Services, Inc., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LOCAL 3, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO, Respondent.
 No. 196.
 No. 197.
 Docket 28597.
 Docket 28627.
 United States Court of Appeals Second Circuit.
 Argued December 18, 1964.
 Decided January 7, 1965.
 
 Leonard Seiser, New York City, for petitioner employer.
 Glen M. Bendixsen, Attorney, N. L. R. B., Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, N. L. R. B.), for Board as respondent and petitioner.
 Harold Stern, New York City (Norman Rothfeld, New York City, of counsel), for respondent Union.
 Before FRIENDLY, HAYS and MARSHALL, Circuit Judges.
 HAYS, Circuit Judge.
 
 
 1
 These two cases which were briefed and argued together involve two aspects of the same controversy. The controversy arose out of a strike of certain employees of the New Power Wire and Electric Corp. The purpose of the strike was to obtain recognition of Local 3 of the International Brotherhood of Electrical Workers as the bargaining agent of the employees. Picketing by the striking employees led to charges of violation of Section 8(b) (1) (A) and Section 8(b) (4) (i) (ii) (B) of the National Labor Relations Act, 29 U.S.C. § 158(b) (1) (A) and § 158(b) (4) (i) (ii) (B). The Board held that the Union violated Section 8(b) (1) (A) but dismissed the complaint charging violation of Section 8(b) (4) (i) (ii) (B). We approve the Board's action in both respects.
 
 1. Section 8(b) (1) (A)
 Section 8(b) (1) (A) provides that:
 
 2
 "It shall be an unfair labor practice for a labor organization or its agents —
 
 
 3
 "(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 * * *" 61 Stat. 141 (1947), 29 U.S.C. § 158(b) (1) (A) (1958).
 
 
 4
 The record contains ample evidence that the strikers (1) threatened nonstrikers with loss of their jobs and with physical harm, (2) physically attacked one of the nonstriking employees, and (3) sabotaged the Employer's property in the presence of nonstrikers.[1] We reject the reasoning of the Union in seeking to excuse or justify this conduct.
 
 
 5
 The Union argues that, even granting that the strikers conducted themselves as charged, it (the Union) cannot be held responsible.
 
 
 6
 The Board has taken the position that in order to establish the liability of a union for violation of Section 8(b) (1) (A) it is not sufficient that the rank and file members of the union engaged in the coercive conduct. Officials must have participated in, ordered or authorized the conduct. See United Steelworkers (Vulcan-Cincinnati, Inc.), 137 N.L. R.B. 95, 98 (1962); Local 761, Int'l Union of Elec. Workers (General Elec. Co.), 126 N.L.R.B. 123 (1960), enforced per curiam, 287 F.2d 565 (6th Cir. 1961); cf. Great Lakes Dist., Seafarers' Int'l Union (Upper Lakes Shipping, Ltd.), 139 N.L.R.B. 216, 219 (1962). This rather narrow conception of who constitute the union may be open to further consideration when a case arises which makes such consideration necessary. In the present case those who engaged in the prohibited conduct were members of the strike committee chosen by the strikers to direct the strike and organize the picketing. They were representatives of the Union for the purposes of the strike and were recognized as such by both the rank and file and the business agent of the Union. See National Labor Relations Board v. Local 815, Int'l Brotherhood of Teamsters, 290 F.2d 99 (2d Cir. 1961). Apart from this it is probable that the participation of the business agent, who regularly visited the picket lines, received reports from the committee, met with the strikers from time to time and knew of at least some of the incidents of misconduct, would be sufficient to implicate the Union. But in any event it is quite clear that a union cannot leave the direction of a strike and picketing to a "strike committee" and escape liability for the activities of the committee.
 
 
 7
 We will enforce the order of the Board against Local 3.
 
 2. Section 8(b) (4) (i) (ii) (B)
 
 8
 Section 8(b) (4) provides, in relevant part, that:
 
 
 9
 "It shall be an unfair labor practice for a labor organization or its agents —
 
 
 10
 * * * * * *
 
 
 11
 "(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to * * * transport, or otherwise handle or work on any goods * * * or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is —
 
 
 12
 * * * * * *
 
 
 13
 "(B) forcing or requiring any person to cease * * * handling, transporting, or otherwise dealing in the products of any other * * * manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9: Provided, that nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing * * *" 73 Stat. 542 (1959), 29 U.S.C. § 158(b) (4) (i) (ii) (B) (Supp. V, 1964).
 
 
 14
 The issue here is whether the picketing in which the striking employees engaged was "primary" picketing, which is authorized by the proviso of Section 8(b) (4) (i) (ii) (B) and protected by Section 7 of the Act or "secondary" picketing which is condemned by Section 8(b) (4) (i) (ii) (B).
 
 
 15
 New Power Wire and Electric Corp., the Employer, is in the business of doing rewiring work under contract with apartment house owners throughout New York City. At the time the strike began the Employer was doing work in fifteen to twenty buildings. The strikers posted pickets at most of these buildings. Strikers also picketed the Employer's headquarters. The picketing was carried on only during working hours. When the Employer completed its work on a contract in a particular building, picketing of that building was discontinued.
 
 
 16
 The picketing at the Employer's office was clearly primary picketing. But if the striking employees had been limited to picketing the Employer's office the picketing would have been practically pointless, since the nonstriking employees at whom the picketing was directed spent their working hours at the sites where the Employer was doing its contract work. Frequently these employees went directly to and from their jobs, not stopping at the Employer's office at all. There was, therefore, a particular need for the picketing of neutral premises, i. e., the contracting apartment houses.
 
 
 17
 Common situs picketing of this kind is governed by the Moore Drydock rules, which are designed to assure that, as far as is practicable, the picketing will be directed at the primary employer. Sailors' Union of the Pacific (Moore Drydock Co.), 92 N.L.R.B. 547 (1950). In the present case the Union concededly observed in most respects the Moore Drydock criteria (picketing at the situs of the dispute at times when the situs was on the picketed premises and the Employer was engaged in its normal business at the situs, in places reasonably close to the situs, disclosing that the dispute was only with the primary employer). See Local 761, Int'l Union of Elec. Radio & Mach. Workers v. National Labor Relations Board, 366 U.S. 667, 677, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961); National Labor Relations Board v. Local 294, Int'l Brotherhood of Teamsters, 284 F.2d 887, 890 (2d Cir. 1960).
 
 
 18
 The Employer claims, however, that the picketing failed to meet the Moore Drydock requirements because the picketing continued at certain places during periods when the Employer had no employees at those places. Because of the strike, the Employer was unable to keep its work going at all times at all the buildings with which it had contracts. At the buildings at which it was necessary to suspend work temporarily, supervisory employees visited almost daily to check on materials and tools and to observe the picketing. Picketing continued during these periods of temporary suspension, but was discontinued immediately when the electrical work was completed.
 
 
 19
 A literal application of the Moore Drydock rules, which are, after all, only general guidelines, should not be permitted to lead us to the conclusion that the Union was required to forego further picketing wherever it was successful in reducing the Employer's work force so that the Employer had to suspend work temporarily. See Local 761, Int'l Union of Elec. Workers v. National Labor Relations Board, supra, at 680; Seafarers Int'l Union v. National Labor Relations Board, 105 U.S.App.D.C. 211, 265 F.2d 585, 590 (1959). Moreover, Moore Drydock need not be interpreted to require that the union play a hide-and-seek game with the employer, removing the pickets when the employer sees fit to remove employees and sending them back when the employer, finding the pickets removed, rushes its employees back to the job.
 
 
 20
 We affirm the Board's conclusion that the picketing in this case was primary picketing and did not violate Section 8(b) (4) (i) (ii) (B). We deny the petition.
 
 
 
 Notes:
 
 
 [1]
 Destruction of the employer's property restrains the employees in the exercise of their rights under Section 7 by threatening their jobs and by creating a general atmosphere of fear of violence