387 F.2d 79
 MARKWELL AND HARTZ, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
BUILDING AND CONSTRUCTION TRADES COUNCIL OF NEW ORLEANS, AFL-CIO, Respondent.
 No. 23083.
 No. 23214.
 United States Court of Appeals Fifth Circuit.
 December 4, 1967.
 
 1
 Richard C. Keenan, New Orleans, La., Wells T. Lovett, Owensboro, Ky., Winthrop A. Johns, Washington, D. C. (amicus curiae) for petitioner Markwell and Hartz, Inc.
 
 
 2
 Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Morton J. Come, Atty., N. L. R. B., Louis Sherman, (intervenor) Charles R. Donnenfeld, Washington D. C. (intervenor), for respondent N. L. R. B.
 
 
 3
 Marcel Mallet-Provost, Asst. Gen. Counsel, N. L. R. B., Morton J. Come, Atty., N. L. R. B., Winthrop A. Johns, Washington, D. C. (amicus curiae), for petitioner N. L. R. B.
 
 
 4
 Victor H. Hess, Jr., New Orleans, La., Louis Sherman, (intervenor) Charles R. Donnenfeld, Washington, D. C. (intervenor), for respondent Bldg. and Constr. Trades Council of New Orleans, AFL-CIO.
 
 
 5
 Before RIVES and WISDOM, Circuit Judges, and CONNALLY, District Judge.
 
 CONNALLY, District Judge:
 
 6
 The above styled and related actions have been consolidated. Both result from picketing by the Building and Construction Trades Council of New Orleans, AFL-CIO ("Council" or "Trades Council" hereafter), of a common situs construction project, which the National Labor Relations Board has held to constitute a secondary boycott, violative of Section 8(b) (4) (B) of the Labor-Management Relations Act [29 U.S.C.A. § 158 (b) (4) (B)]. In the earlier appeal (No. 23083) by the employer with whom the dispute existed, we affirm[1] the findings of the Board that the employer is not entitled to further relief. In the latter (No. 23214), we likewise agree with the Board, and order enforcement.
 
 
 7
 Briefly stated, the facts are these. In September of 1963 Markwell and Hartz, Inc. was the general contractor for the expansion of a filtration plant at the East Jefferson Water Works, District No. 1, in Jefferson Parish, Louisiana. Prior to beginning construction, Markwell and Hartz entered into an agreement with District 50 of the United Mine Workers of America whereby District 50 became the recognized bargaining agent for Markwell and Hartz's employees. Also prior to beginning construction, Markwell and Hartz contracted with two subcontractors, Binnings Construction Company, Inc. ("Binnings") and Walter J. Barnes Electrical Company ("Barnes") to perform the pile driving and electrical work, respectively. It performed the remainder of the work, consisting of approximately 80%, itself. Employees of both Binnings and Barnes were represented by the respondent Trades Council.
 
 
 8
 Immediately a dispute arose between Markwell and Hartz and the Trades Council. The latter sought to become the bargaining representative of the Markwell and Hartz employees. On October 17, 1963, the Council began to picket the project.
 
 
 9
 Shortly after the picket line appeared, Markwell and Hartz endeavored to insulate its subcontractors Binnings and Barnes, who were neutrals in the labor controversy, from the effects of the picketing. It did so by establishing four separate gates, three for the exclusive use of the subcontractors, their employees and suppliers; the fourth for the exclusive use of its own employees and suppliers. Despite the clear delineation by signs distinguishing between the subcontractors' gates and that for the use of the general contractor, the Council continued to picket all gates until enjoined by the District Court for the Eastern District of Louisiana on January 15, 1964. As a result of the picketing, the employees of Binnings and of Barnes refused to work on the project.
 
 
 10
 Acting on a complaint lodged by Markwell and Hartz, the National Labor Relations Board entered an order generally favorable to Markwell and Hartz, declaring that after November 16, 1963 (at which time the gates had been clearly marked) the Council had engaged in an unfair labor practice violative of Sections 8(b) (4) (i) and (ii) (B) of the Act. The Board found that one of the purposes of the picketing of the subcontractors' gates was to cause Binnings and Barnes (the neutrals) to cease doing business with Markwell and Hartz. The Board issued a typical cease and desist order.
 
 
 11
 The case is before this Court primarily on the Board's petition to enforce its order, while Markwell and Hartz seeks additional findings in its favor.
 
 
 12
 At the outset, it should be noted that the dispute that gave rise to the picketing was not between Markwell and Hartz and its employees. Nor was the dispute, in practical effect, between Markwell and Hartz and the Trades Council. The real adversaries were District 50 of the United Mine Workers and the Trades Council, the latter being the also-ran in the race to see who would be the bargaining representative of Markwell and Hartz's employees. District 50 has appeared as amicus curiae, urging enforcement of the Board's order. Hence the dispute was jurisdictional in nature.
 
 
 13
 It is the Trades Council's position that the facts of this case bring it within the ambit of Local 761, IUE, etc. v. NLRB, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961), popularly known as the General Electric case. The Trades Council further argues that the General Electric case and the Carrier case [United Steel workers v. NLRB, 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964)], have, sub silentio, overruled the Supreme Court's decision in NLRB v. Denver Building & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). We do not agree with this position.
 
 
 14
 Attempts to distinguish between protected primary picketing and the forbidden secondary activity — particularly at a common situs where employees of the primary and of the secondary employers work side by side — have been the source of much litigation both before the Board and in the Courts.[2] Much of the uncertainty which formerly shrouded this question has been clarified, we think, by General Electric wherein the question and the various authorities are reviewed at length, and by Carrier which follows and approves General Electric. These are the cases primarily relied upon by the Trades Council.
 
 
 15
 In General Electric, that company was the primary employer engaged in a dispute with its own employees at its own plant. A number of subcontractors were performing various services for General Electric at the plant site. Separate gates were clearly designated for the exclusive use of these subcontractors. The work performed by the subcontractors was of different types, the distinction being emphasized by the court as "routine maintenance service" — which at times was performed by General Electric's own employees, and occasionally subcontracted out — as distinguished from "specialized work of a capital-improvement nature" (366 U.S. at p. 669, 81 S.Ct. at p. 1287). There Mr. Justice Frankfurter, speaking for the Court, without dissent, rejected the argument of the Union that all picketing at the plant of the struck employer should be considered primary, stating:
 
 
 16
 "In rejecting the ownership test in situations where two employers were performing work upon a common site, the Board was naturally guided by this Court's opinion in Rice Milling, in which we indicated that the location of the picketing at the primary employer's premises was `not necessarily conclusive' of its legality. 341 U.S. at 671 [71 S.Ct. at 964, 95 L.Ed. 1277]. Where the work done by the secondary employees is unrelated to the normal operations of the primary employer, it is difficult to perceive how the pressure of picketing the entire situs is any less on the neutral employer merely because the picketing takes place at property owned by the struck employer. The application of the Dry Dock tests to limit the picketing effects to the employees of the employer against whom the dispute is directed carries out the `dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own.' Labor Board v. Denver Building Council, supra, at 692 [71 S.Ct. at 953]." 366 U.S. at p. 679, 81 S.Ct. at p. 1292.
 
 And further, the Court stated:
 
 17
 "* * * The key to the problem is found in the type of work that is being performed by those who use the separate gate. It is significant that the Board has since applied its rationale, first stated in the present case, only to situations where the independent workers were performing tasks unconnected to the normal operations of the struck employer — usually construction work on his buildings." Id. at p. 680, 81 S.Ct. at p. 1293.
 
 
 18
 Three years later in Carrier the Court, again without dissent, rejected the theory that ownership or control of the site of the picketing was controlling. There Carrier was engaged in a dispute with its employees, at its own plant. The picketing in question took place at a railroad spur track, owned by the railroad and used exclusively by the railroad and its employees, but located immediately adjacent to Carrier's plant and used for the delivery of supplies and removal of the manufactured products of Carrier. Approving and reaffirming the test of General Electric, the Court in Carrier held that the ownership of the railroad spur was immaterial, and that it was in fact, no more than another gate to the Carrier plant; hence the picketing at such gate to inform the railroad and its employees who were suppliers of Carrier of the existence of the dispute was primary and protected activity.
 
 
 19
 Thus the question posed here is whether the work of subcontractors Binnings and Barnes was "related to the normal operations" of Markwell and Hartz (as, for example, ordinary maintenance as in General Electric), in which event the picketing is primary; or whether it is unrelated to the normal operations (as "of a capital improvement nature").
 
 
 20
 While it would seem clear from a statement of this test that the work of Binnings and Barnes, consisting of specialized work for which Markwell and Hartz was unequipped and unable to perform itself, was of the unrelated variety, we need not speculate upon the answer to this question. It is answered authoritatively in Denver, supra. That case involved a construction project common situs where employees of the general and the subcontractors worked side by side. In a dispute with the subcontractor, picketing was likewise directed at the employees of the prime. There, as here, it was found that an object of such picketing was to force or require the cessation of business, one with the other, and to force a termination of the subcontract. Deciding the question here in controversy, the Court stated:
 
 
 21
 "We agree with the Board also in its conclusion that the fact that the contractor and subcontractor were engaged on the same construction project, and that the contractor had some supervision over the subcontractor's work, did not eliminate the status of each as an independent contractor or make the employees of one the employees of the other. The business relationship between independent contractors is too well established in the law to be overridden without clear language doing so. The Board found the relationship between [the prime contractor] and [the subcontractor] was one of `doing business' and we find no adequate reason for upsetting that conclusion." 341 U.S. at pp. 689-690, 71 S.Ct. at p. 952.
 
 
 22
 The Trades Council argues that there is a conflict between Denver, on the one hand, and General Electric and Carrier, on the other. We find no such conflict. Denver is cited with approval in General Electric.
 
 
 23
 The Council further argues that Denver should be limited to its precise facts, that is, where the dispute is with a subcontractor and the general contractor is a neutral. Such a position is supported by neither logic nor authority. The statute, in condemning the secondary boycott, makes no such distinction and we are unable to say that it is less an unfair labor practice to bring economic pressure on a subcontractor to induce him to breach his contract and cease doing business with the prime, rather than where the parties are reversed. See Piezonki v. N. L. R. B., 219 F.2d 879 (4th Cir. 1955); Local Union No. 55 (PBM), 108 N.L.R.B. 363, affd. 218 F.2d 226 (10th Cir. 1954); Metal Polishers Union, 86 N.L.R.B. 1243 (cited in Denver Trades Council, 341 U.S. at 690, 71 S.Ct. 943); Cf. Construction & Gen. Lab. Loc. U. No. 438 v. Hardy Eng. & Const. Co., 354 F.2d 24 (5th Cir. 1965).
 
 
 24
 Holding as we do that the subcontractors here were entitled to protection from the Trades Council's picketing, the Trades Council was obliged to restrict its picketing in conformity with the Moore Dry Dock criteria.[3] See Sailor's Union of the Pacific (Moore Dry Dock), 92 N.L.R.B. 547 (1950). The Board was warranted in concluding that the Trades Council's picketing was not in accord with Moore Dry Dock requirements and, therefore, an unfair labor practice.
 
 
 25
 On October 9, 1967, long after submission of this action, counsel for the N.L.R.B. filed with the clerk of this Court slip opinion of the Court of Appeals for the Sixth Circuit in N. L. R. B. v. Nashville Bldg. & Construction Trades Council, Oct. 5, 1967, 383 F.2d 562. This opinion deals with precisely the question considered here, in a similar controversy between Markwell & Hartz, the Nashville Council, and the United Mine Workers. We have considered that opinion as well as the brief filed October 27, 1967, by New Orleans Building and Trades Council in reply thereto. We cite the Sixth Circuit opinion in support of the views expressed above, and agree with the observation there made (last paragraph) that "if appellant's contention in this case is to prevail, it is a decision for the Supreme Court or for the Congress."
 
 
 26
 Enforcement of the Board's order is granted.
 
 
 
 Notes:
 
 
 [1]
 This appeal has not been seriously urged
 
 
 [2]
 See, e.g., United Brotherhood of Carpenters, 81 N.L.R.B. 802; United Electrical Workers (Ryan Const. Corp.), 85 N.L. R.B. 417; Retail Fruit & Vegetable Clerks (Crystal Palace Mkt.), 116 N.L. R.B. 856; Superior Derrick Corp. v. N.L.R.B., 273 F.2d 891 (5th Cir. 1960)
 
 
 [3]
 The Board has often applied Moore Dry Dock standards to construction site picketing. See I.C.G. Elec. Inc., 142 N.L. R.B. 1418 (1963); Levitt Corp., 127 N.L. R.B. 900 (1960); St. Bridget's Catholic Congregation, Inc., 122 N.L.R.B. 1341 (1959)
 
 
 RIVES, Circuit Judge (specially concurring):
 
 27
 It seems to me that the work of the subcontractors Binnings and Barnes was "related to the normal operation" of the general contractor Markwell and Hartz, Inc. (M & H). M & H was obligated by contract to complete the filtration plant expansion job. It decided to perform about four-fifths in cost of the project with its own employees and to subcontract the balance. The pile-driving contract was awarded to Binnings and the electrical work to Barnes. When Binnings' crews honored the picket line, M & H used its own employees to complete the pile driving. While Barnes' electrical work was more highly specialized, I do not find any contention that M & H could not have employed men to do that work.
 
 
 28
 The two dissenting members of the Board definitely stated that, "In applying the General Electric standards to the instant case, we find that the work of Binnings and Barnes was related to the normal operations of M & H, the general contractor." (R. 112.) The reasons for that finding were then elaborately stated. The three majority members of the Board agreed that "* * * the work of the neutral subcontractors in one sense is `related to M & H's normal operations'," but nevertheless thought that the dissent's analysis "runs counter to firmly established principles governing common situs picketing in that (the construction) industry." (R. 96.)
 
 
 29
 When the work done by the secondary employees is related to the normal operations of the primary employer there remains a distinction between picketing at the situs of the primary employer and picketing at a common situs where two or more employers are performing separate tasks on common premises. It seems to me that the opinion in General Electric clearly recognizes that distinction and approves the four Moore Dry Dock standards as applicable to common situs picketing. (See 366 U.S. at 676-679, 81 S.Ct. 1285.) The Carrier case went no further than General Electric and continued to recognize the importance of the location of the picketing (376 U.S. at 497, 84 S.Ct. 899).
 
 
 30
 I agree that General Electric and Carrier are not inconsistent with Denver. Denver relates to common situs picketing. General Electric and Carrier involve illegal picketing at the premises of a struck manufacturer. Except for this difference in reasoning, I concur fully with Judge Connally.
 
 WISDOM, Circuit Judge (dissenting):
 
 31
 I respectfully dissent.
 
 
 32
 I agree with the Court that in this case the General Electric work-related standard should be applied. The difficulty I have with the majority opinion is that the Court accepts the Board's cavalier consideration of General Electric and enforces the Board order — although the Board rejected the work-related standard. The Board inferred an unlawful objective simply from the picketing of the reserved gate. I am with the dissenting Board members in their view that there should be an inquiry into whether the appeals through picketing to secondary employees constituted permissible primary activity. I would remand the case to the Board for a finding on the issue of relatedness with suggestions that the Board formulate criteria for determining relatedness in common situs cases, carrying out the principles expressed in General Electric and Carrier.
 
 
 33
 With deference, I must say that I am not as certain as the Court that General Electric and Carrier clarified Denver and do not conflict with that decision. Denver (which did not involve reserved gates) applied the Moore Dry Dock criteria — regardless of whether the secondary employer's work was related to the normal operations of the primary employer. In the Board's decision in N. L. R. B. v. Nashville Building and Construction Trades Council, 164 NLRB No. 50, enforced, 6 Cir. 1967, 383 F.2d 562, involving the same question at issue here in a controversy also involving Markwell & Hartz, the Board said:
 
 
 34
 "For in view of our holding in Building and Construction Trades Council of New Orleans, AFL-CIO (Markwell & Hartz, Inc.), 155 NLRB 319, that the legality of picketing at a common situs in the construction industry is to be determined under the Moore Dry-dock standards, rather than the special guidelines laid down by the Supreme Court in Local 761, IUE (General Electric Corporation v. N. L. R. B.), 366 U.S. 667 [81 S.Ct. 1285, 6 L.Ed. 2d 592], the work relationship test set forth in the latter is inapposite herein." (Emphasis added.)
 
 
 35
 In short, the Board's Nashville decision acknowledges explicitly that a majority of that Agency is of the view that the standards announced by the Supreme Court in General Electric and Carrier should not be applied in the context of construction industry picketing.
 
 
 36
 * * *
 
 
 37
 The provisions of Section 8(b) (4)[1] reflect "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own". Denver, 341 U.S. at 692, 71 S.Ct. at 953.[2] Courts and the Board have had a hard struggle to give meaning to this policy in concrete cases. "Through the many shifts of emphasis and approach manifested by the precedents, perhaps the most stable element has been discord".[3]
 
 
 38
 Section 8(b) (4), the secondary boycott provision, prohibits all union activity "where * * * an object thereof is forcing or requiring" an employer to cease doing business with "any person". Although the language of the section is broad, the section prohibits only secondary picketing.[4] Judge Learned Hand has said: "The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands".[5]
 
 
 39
 The line between primary and secondary activity is relatively easy to draw where the primary and secondary employers have separate work-sites. Thus, union activity occurring at a manufacturer's own premises, and seeking no more than the disruption of his own normal operations, is considered primary and within the traditional area of protected union activity. On the other hand, activity extending beyond the premises of the primary employer to those of another employer, and designed to disrupt the operations of the latter employer, is secondary and prohibited. Compare N. L. R. B. v. International Rice Milling Co., 341 U.S. 665, 672, 71 S.Ct. 961, 95 L.Ed. 1284, with N. L. R. B. v. United Brotherhood of Carpenters, etc., 10 Cir. 1950, 184 F.2d 60, cert. denied, 341 U.S. 947, 71 S.Ct. 1011, 95 L.Ed. 1371. And see generally Retail Fruit & Vegetable Clerks Union (Crystal Palace Market) v. N. L. R. B., 9 Cir. 1957, 249 F.2d 591, 597-600.
 
 
 40
 A more difficult problem is presented in the common situs cases — "situations where two employers were performing separate tasks on common premises". General Electric, 366 U.S. at 676, 81 S.Ct. at 1291. Early in the development of the law under section 8(b) (4), therefore, the Board evolved criteria to aid in determining whether picketing at a common situs was primary or secondary. In Sailor's Union (Moore Dry Dock Co.), 92 NLRB 546, 549 (1950), a case in which the primary employer's ship was temporarily located at the secondary employer's dock, the Board stated:
 
 
 41
 In the kind of situation that exists in this case, we believe that picketing * * * is primary if it meets the following conditions: (a) The picketing is strictly limited to times when the situs of the dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the situs; (c) the picketing is limited to places reasonably close to the locations of the situs; and (d) the picketing discloses clearly that the dispute is with the primary employer. [Emphasis in original.]
 
 
 42
 The Board has since applied these "Moore Dry Dock standards" in common situs situations generally,[6] whether the premises were owned by the secondary employer (as in Moore, itself), the primary employer,[7] or some third party,[8] and whether the picketing union's dispute was with the general contractor[9] or the subcontractor.[10]
 
 
 43
 Common situs picketing in the construction industry raises special problems. The building trades unions have always contended that construction of a building is an integrated enterprise in which the subcontractors are interrelated allies of the prime contractor, not independent neutrals.[11] In Denver, however, the Supreme Court rejected this contention. Instead, the Court looked to the traditional legal concept of the relationship between a prime contractor and his subcontractors: The subcontractors are independent contractors whose employees are not the employees of the prime contractors.[12] As separate legal entities, they are entitled to protection from secondary boycotts. The construction industry, therefore, is subject to the same restrictions as are other industries in regard to common situs picketing.[13] For purposes of the instant case, it is important to note that in Denver the Court did not consider the type of work performed by the subcontractor. The test was not the relatedness of the subcontractor's work to the normal operations of the prime contractor; the test was whether one of the objects of the picketing was to force the prime contractor to cease doing business with the subcontractor.
 
 
 44
 Denver has been criticized. Numerous bills have been introduced in Congress to overrule its holding. But Denver still stands. Here the Board rested its decision squarely on Denver and Moore Dry Dock.
 
 
 45
 The Trades Council and the dissenting members of the Board rely on General Electric. They contend that under General Electric the lawfulness of reserved gate picketing as a primary activity depends on "the type of work that is being performed by those who use the separate gate". 366 U.S. at 680, 81 S.Ct. at 1293.
 
 
 46
 In General Electric the Court recognized that the distinction between primary and secondary activities "does not present a glaringly bright line". But the Act requires that a line be drawn, even if it be "more nice than obvious". The Court addressed itself to all secondary boycott cases:
 
 
 47
 `Almost all picketing, even at the situs of the primary employer and surely at that of the secondary, hopes to achieve the forbidden objective, whatever other motives there may be and however small the chances of success.' (citation omitted) But picketing which induces secondary employees to respect a picket line is not the equivalent of picketing which has an object of inducing those employees to engage in concerted conduct against their employer in order to force him to refuse to deal with the struck employer. (citation omitted) (emphasis supplied.) 366 U.S. at 673, 81 S.Ct. at 1289.
 
 As the dissenting Board members stated:
 
 48
 The whole thrust of the Court's General Electric decision and the Carrier Corporation decision is that the inference of unlawful object cannot be based simply on the fact that the picketing occurs at gates used solely by neutral employees, for the proviso to Section 8(b) (4) (B) protects all primary strike pressures which are applied with the object of halting the day-to-day operations of the struck employer * * *. The Court expressly rejected the view of the Court of Appeals for the Second Circuit "that picketing at the site of a strike could be directed at secondary employees only where incidental to appeals to primary employees." In so doing, the Court firmly established the proposition that direct appeals to employees of neutrals "whose mission is selling, delivering or otherwise contributing to the operations which the strike is endeavoring to halt" constitute protected primary activity * * *.
 
 
 49
 General Electric involved appeals to neutral subcontractors. "The key to the problem is found in the type of work that is being performed by those who use the separate gate". 366 U.S. at 680, 81 S.Ct. at 1293.
 
 
 50
 In Carrier the Court used the same key. Referring to General Electric, the Court observed:
 
 
 51
 The Court accepted the approach neither of the Board nor of the Union. The location of the picketing, though important, was not deemed of decisive significance; picketing was not to be protected simply because it occurred at the site of the primary employer's plant. Neither, however, was all picketing forbidden where occurring at gates not used by primary employees. The legality of separate gate picketing depended upon the type of work being done by the employees who used that gate; if the duties of those employees were connected with the normal operations of the employer, picketing directed at them was protected primary activity, but if their work was unrelated to the day-to-day operation of the employer's plant, the picketing was an unfair labor practice. The order of the NLRB was vacated to permit the termination of the case in accordance with the proper test. 376 U.S. at 497-498, 84 S.Ct. at 903.
 
 
 52
 The Board attempts to distinguish away General Electric and Carrier on the ground that they were the product of the "lenient treatment * * * given to strike action taking place at the separate premises of a struck employer". Those decisions, so the Board and the Court here say, were not intended to upset the traditional approach to common situs problems in the construction industry. Relying therefore on Denver (although Denver did not involve a separate gate) and on the Moore Dry Dock criteria, the Board found that the timing and the picketing at the reserved gates were not intended to reach the employees of Markwell and Hartz but had the unlawful object of inducing strike action by the employees of neutral Binnings and Barnes.
 
 
 53
 General Electric and Carrier cannot be brushed off lightly. They represent an attempt to show in what circumstances picketing of a secondary employer is permissible. Under General Electric, not all independent contractors are neutrals: They lose their neutral status when their work is related ("necessary") to the normal or day-to-day operations of the primary employer.
 
 
 54
 Here the Board apparently limited the use of the term "common situs" to situations where the primary and secondary employers are engaged in operations on premises owned by a third person or by a secondary employer. But the Supreme Court in General Electric used the term "common situs" to refer to any location where both the primary and the secondary employers were present. 366 U.S. at 676, 81 S.Ct. 1285. The Board itself, in Crystal Palace Market, 116 NLRB 856, 859 (1956) stated: "[Moore Dry Dock] principles should apply to all common situs principles, including cases where, as here, the picketed premises are owned by the primary employer. We can see no logical reasons why the legality of such picketing should depend on title to property." The effect of the Board's decision is to apply more rigid standards to the construction industry than to the manufacturing industry. Any prime contractor would be able to frustrate the purposes of picketing by opening gates reserved for his subcontractors.
 
 
 55
 The Board assumes that if the related-work standard is applied to common construction situs, General Electric must be considered as having overruled Denver sub silentio. In Denver, however, the Court focused on the point that contractors and subcontractors on a construction project are not necessarily so interconnected that they should all be regarded as one entity. The Court did not hold that as a matter of law all independent contractors on a common situs must be considered as neutrals. In General Electric the Court accepted the Denver holding that subcontractors are separate legal entities and accepted the principle that the union may appeal to employees of a secondary employer. The Court then focused on the criteria for determining when and how the union may reach the employees of the secondary employer. The touchstone furnished by Carrier as well as by General Electric is relatedness of work. To the extent that the conclusions in Denver were arrived at independent of any consideration of relatedness, those conclusions must be considered as modified by application of the relatedness standard set down in General Electric. Here, therefore, the Board should have made a finding on the issue of relatedness. An unlawful object under Section 8(b) (4) cannot be inferred simply from the fact that the union has picketed at a gate reserved for the subcontractors' employees.
 
 
 56
 Since the Board has considered General Electric inapposite and has not made any finding on the issue of relatedness of work, the case should be remanded to the Board for such a finding. The Board should make the initial determination, not the Court. It is better able than this Court to formulate criteria in light of preserving the statutory balance between "the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own". Denver, 341 U.S. at 692, 71 S.Ct. at 953.
 
 
 57
 The dissenting members of the Board would apply the "related work" standard only where the dispute is with the general contractor. I agree with the majority on this point: "The plain logic of their position is equally applicable where the primary dispute is with a building subcontractor whose employees are working closely with employees of other subcontractors or those of the general contractor."
 
 
 58
 The statute, in condemning the secondary boycott, makes no such distinction and we are unable to say that it is less an unfair labor practice to bring economic pressure on a subcontractor to induce him to breach his contract and cease doing business with the prime, rather than where the parties are reversed. See Piezonki v. N. L. R. B., 4 Cir. 1955, 219 F.2d 879; Local Union No. 55 (PBM), 108 NLRB 363, aff'd 10 Cir. 1954, 218 F.2d 226; Metal Polishers Union, 86 NLRB 1243 (cited in Denver Trades Council, 341 U.S. at 690, 71 S.Ct. 943); cf. Construction & Gen. Lab. Loc. U. No. 438 v. Hardy Eng. & Const. Co., 5 Cir. 1965, 354 F.2d 24.
 
 
 59
 The Court cites with approval N. L. R. B. v. Nashville Bldg. & Construction Trades Council, 6 Cir. 1967, 383 F.2d 562, upholding the Board on the precise issue before us now. Unlike the Court in this case, however, the Sixth Circuit made no inquiry into whether the work of the secondary employer was related to that of the primary employer. The Sixth Circuit accepted, apparently with no reservations, that picketing of reserved gates is unlawful. The majority quote Judge Edwards's observation "if appellant's contention in this case is to prevail, it is a decision for the Supreme Court or for Congress". I would put it the other way. There is nothing in General Electric or Carrier to suggest that the construction industry should be treated differently from other industry. The power to carve out an exception to the Act is a power that reposes in Congress — not in the Board, not in this Court.
 
 
 
 Notes:
 
 
 [1]
 Section 8(b) (4) of the amended Act makes it an unfair labor practice for a union —
 (i) to engage in, or to induce or encourage any individual * * * to engage in, a strike, or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, material or commodities or to perform any services; or
 (ii) to threaten, coerce, or restrain any person * * * where in either case an object thereof is:
 * * * * *
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.
 
 
 [2]
 N.L.R.B. v. Denver Building & Constr. Trades Council, 1951, 341 U.S. 675, 692, 71 S.Ct. 943, 95 L.Ed. 1284
 
 
 [3]
 Lesnick, "The Gravamen of the Secondary Boycott", 62 Colum.L.Rev. 1363, 1365 (1962). On the issue generally, see Lesnick, Koretz, "Federal Regulation of Secondary Strikes and Boycotts — Another Chapter", 59 Colum.L.Rev. 125, 129 (1959); Lesnick, Zimmerman, "Secondary Picketing and the Reserved Gate: TheGeneral Electric Doctrine", 47 Va. L.Rev. 1164 (1961); Comment, "Common Situs Picketing and the Construction Industry", 54 Geo.L.J. 962 (1966); Note, 44 Texas L.Rev. 794 (1966).
 
 
 [4]
 See Lesnick, The Gravamen of the Secondary Boycott, 62 Colum.L.Rev. 1363, 1398-99 (1962), where the author states: "The major supports, in the statute as enacted in 1947, for a rejection of a literal approach to section 8(b) (4) have been sections 7 and 13. Section 7 purports to guarantee labor the right to engage in concerted activities, including strikes and picketing, for the purpose of mutual aid or protection, and section 13 permits inroads on that right only as specifically provided for in the act. It has been asserted that section 8(b) (4), as construed by a literal approach, is so pervasive that it `does violence' to sections 7 and 13, and an alternative approach to the section must therefore be adopted. This contention rests on more than a literal reading of section 13; it finds in that section a mandate, not only to avoid resort to general statements and policies, expressed or implicit in the act, to restrict labor's use of its traditional weapons, but also to shrink from accepting on its face the directions of an articulated prohibition when to do so would seem to go `too far.'"
 
 
 [5]
 International Board of Electrical Workers v. N.L.R.B., 2 Cir. 1951, 181 F.2d 34, aff'd, 341 U.S. 694, 71 S.Ct. 954, 95 L. Ed. 1299
 
 
 [6]
 This and other courts have approved the Board's general application of the Dry Dock standards. Local 761, Electrical Workers v. N.L.R.B. (General Electric Co.), 366 U.S. 667, 676-679, 81 S.Ct. 1285, 6 L.Ed.2d 592; N.L.R.B. v. Truck Drivers & Helpers Local Union No. 728, 5 Cir. 1956, 228 F.2d 791, 796; N.L.R.B. v. International Brotherhood of Electrical Workers, Local 861, 5 Cir. 1965, 353 F.2d 736; N.L.R.B. v. Local 254, Building Service Employees, 1 Cir. 1966, 359 F.2d 289, 292; New Power Wire & Electric Corp. v. N.L.R.B., 2 Cir. 1964, 340 F.2d 71, 74; N.L.R.B. v. Highway Truckdrivers, Local No. 107, 3 Cir. 1962, 300 F.2d 317, 321; Piezonki v. N.L.R.B., 4 Cir. 1955, 219 F.2d 879, 883; N.L.R.B. v. Chauffeurs, Local Union No. 135, 7 Cir. 1954, 212 F.2d 216, 219; N.L. R.B. v. International Hod Carriers, Local 1140, 8 Cir. 1960, 285 F.2d 397, 400-401, cert. denied, 366 U.S. 903, 81 S.Ct. 1047, 6 L.Ed.2d 203; Retail Fruit & Vegetable Clerks Union, Local 1017 v. N.L.R.B., 9 Cir. 1957, 249 F.2d 591, 595-597; N.L.R.B. v. Local Union No. 55, 10 Cir. 1954, 218 F.2d 226, 231; Seafarers International Union v. N.L.R.B., 1959, 105 U.S.App.D.C. 211, 265 F.2d 585, 589
 
 
 [7]
 As in Retail Fruit & Vegetable Clerks Union, Local 1017, 116 NLRB 856, enforced, 9 Cir. 1957, 249 F.2d 591
 
 
 [8]
 As in Atomic Projects & Production Workers, 120 NLRB 400, enforced, Office Employees International Union, Local No. 251, AFL-CIO v. N.L.R.B., 1959, 105 U.S.App.D.C. 13, 262 F.2d 931
 
 
 [9]
 Local Union No. 55 (PBM), 108 NLRB 363, enforced, 10 Cir. 1954, 218 F.2d 226; Eau Claire and Vicinity Building and Construction Trades Council, 122 NLRB 1341; Hermandad de Trabajadores de la Construction, 127 NLRB 900
 
 
 [10]
 E.g., Brotherhood of Painters, Local Union No. 193, 110 NLRB 455; International Association of Machinists, Local Lodge 889, 120 NLRB 753; International Brotherhood of Electrical Workers, Local 861, 142 NLRB 1006, enforced, 5 Cir. 1965, 353 F.2d 736; Millwrights Local Union No. 1102, 155 NLRB 126
 
 
 [11]
 "The building trades unions have been advancing this argument before Congress (thus far without success) for all of the years since Congress adopted the `secondary boycott' provisions of the Taft-Hartley Act, 61 Stat. 136, 141-142 (1947), as amended, 29 U.S.C. § 158(b) (4) (1964), * * *." N.L.R.B. v. Nashville Building and Construction Trades Council, 6 Cir. 1967, 383 F.2d 562
 
 
 [12]
 "We agree with the Board also in its conclusion that the fact that the contractor and subcontractor were engaged on the same construction project, and that the contractor had some supervision over the subcontractor's work, did not eliminate the status of each as an independent contractor or make the employees of one the employees of the other. The business relationship between independent contractors is too well established in the law to be overridden without clear language doing so. * * *." N.L.R.B. v. Denver Building and Construction Trades Council, 1951, 341 U.S. 675, 689, 71 S.Ct. 943, 952, 95 L.Ed. 1284
 
 
 [13]
 Denver would be distinguishable from the instant case under the rationale set forth by Lesnick, supra note 3, who poses the crucial question thus: "does the picketing union intend to subject the secondary employer to a loss of the services of his employees broader in impact than would be directly caused by the unavailability, as a result of the complete success of the strike, of the services of the primary employees? If so, the picketing is secondary; otherwise, it is primary." 62 Colum.L.Rev. at 1414. "The `intent' that is significant * * * is the intent to subject the secondary to pressure different in kind from that generated against him by a primary strike." Id. at 1412. Under this analysis, where the union dispute is with the general contractor and pressure is put on the neutral subcontractor, the subcontractor is at worst faced with his men off work — a result that would follow if the union were successful in its primary boycott against the general. But where the dispute is with the subcontractor and pressure is put on the general's employees, the general may be faced with a cessation of work on the entire job — a result that would not necessarily occur if the primary boycott against the subcontractor were successful. Thus in the first case the picketing would be lawful (our case), in the second, unlawful (Denver). The Supreme Court, in Denver, however, laid no groundwork for application of this rationale, and this Court rejected it explicitly in Superior Derrick Corp. v. N.L.R.B., 5 Cir. 1960, 273 F.2d 891. General Electric contains nothing that would now convince us otherwise.