## 𝔖taunton

### UNITED PAPERMAKERS & PAPERWORKERS INTERNATIONAL UNION, AFL-CIO, ET AL. v. OLD DOMINION FREIGHT LINE.

September 5, 1969.

Record No. 6913.

Present, All the Justices.

*Betty Southard Murphy* (D.C.) (*Archie O. Wells; Junie L. Bradshaw; Warren Woods* (D.C.) on brief), for plaintiffs in error.

*Frank C. Maloney, III* (*Robert A. Cox, Jr.; Hirschler and Fleischer,* on brief), for defendant in error.

EGGLESTON, C.J., delivered the opinion of the court.

Old Dominion Freight Line filed a motion for judgment against United Papermakers & Paperworkers International Union, AFL-CIO, and United Papermakers & Paperworkers, AFL-CIO, Local 699, to recover damages for the alleged illegal picketing of the plaintiff's premises at 808 Holly Spring Avenue, in the city of Richmond, from

March 14 to March 18, 1966. The defendants filed a general denial of liability. By consent the case was heard ore tenus by the trial court and at the conclusion of the evidence it held that the picketing complained of was illegal and that the plaintiff had suffered damages therefrom amounting to $923.22. Accordingly, it entered final judgment for the plaintiff for this amount and the defendants have appealed. The substance of their assignments of error is that the judgment of the trial court was contrary to the law and the evidence, and that it erred in holding that under the applicable federal statute the picketing was illegal and unlawful.

The pertinent underlying facts are not in dispute and may be summarized thus: Old Dominion Freight Line is a common and contract carrier of freight, with a terminal located at 808 Holly Spring Avenue in the city of Richmond. In March, 1966 there was in effect a contract pursuant to which Old Dominion Truck Leasing, Incorporated, a corporate ally of Old Dominion Freight Line, had leased to Dixie Container Corporation a number of tractors and trailers to be operated by Dixie in its business as an interstate carrier. Under the terms of the contract, Truck Leasing furnished the vehicles with the necessary fuel, licenses, property taxes and insurance, and they were to be maintained and serviced by Freight Line. The leased vehicles were to be driven by employees of Dixie and its name was the only marking shown on them.

Dixie Container Corporation is not a corporate ally of either Freight Line or Truck Leasing, and except for this contract had no connection with either. Dixie's place of business is on Jefferson Davis Highway in the city of Richmond, some distance from Freight Line's terminal.

Pursuant to the terms of the contract the vehicles leased to Dixie were serviced by Freight Line's mechanics after each trip. For this purpose, usually the employees of Freight Line went to the premises of Dixie and drove the vehicles to the terminal of Freight Line where they were serviced and then returned by the employees of Freight Line to Dixie. Occasionally, employees of Dixie drove the vehicles to and from the point where they were thus serviced.

On March 14, 1966 Dixie's employees, including its drivers, went on strike and at the direction of Thomas R. Zimmer, a Dixie employee who was also an officer of United Papermakers & Paperworkers, AFL-CIO, Local 699, pickets were posted at the Dixie plant and also at the two entrances leading from the street into the Freight Line terminal. When William E. Chestnutt, Sr., an official of Freight

Line, observed these pickets he protested and inquired the reason for their presence. He was informed by one of the pickets that they had been posted there because employees of Freight Line were driving Dixie's tractors and trailers into the Freight Line terminal.

After Dixie Container Corporation had filed an unfair labor practice charge against the defendants because of the picket line at Old Dominion Freight Line, the pickets there were withdrawn on March 18.

There is a conflict in the evidence as to the wording of the signs carried by the pickets. Witnesses on behalf of the defendants testified that all of the signs stated "ON STRIKE, DIXIE CONTAINER COMPANY," and that some carried the additional words, "WE WANT A FAIR CONTRACT." However, Chestnutt, a witness for the plaintiff, testified that although he "was looking to see if Dixie Container was on the sign," he saw no such indication on any of them.

There is evidence on behalf of the plaintiff that while the pickets were posted in front of the Freight Line terminal union employees would not cross these picket lines and carry freight into the terminal, and that this resulted in considerable damage to the plaintiff's business. The trial court fixed the amount of this damage at $923.22 and there is no contest as to the amount of this award. The defendants contend, however, that under the law and the evidence the plaintiff was entitled to recover nothing of them.

The plaintiff's right of action, if any, is created by the following provision of the National Labor Relations Act, as amended:

> "(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b) (4) of this title.
>
> "(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit." 73 Stat. 545, 29 U.S.C. § 187.

Section 158(b)(4) of the Act referred to above provides that it shall be unfair labor practice for a labor organization or its agents

\*      \*      \*      \*

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise, handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

        *        *        *        *

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;* * * *." (Emphasis added.) 73 Stat. 542, 29 U.S.C. § 158.

Section 187 (b), *supra,* expressly authorizes federal and state courts to award damages to any person injured by the activities described in § 187 (a), provided the activity complained of is not "any primary strike or primary picketing."

While § 158 (b) (4) does not expressly condemn secondary picketing or secondary boycotting, it outlaws such activity which bears upon some third party who has no concern with the dispute between the employer and the latter's employees. *Local 761, International Union of Electrical, etc., Workers v. National Labor Relations Board,* 366 U. S. 667, 672, 673, 81 S. Ct. 1285, 1289, 6 L. ed. 2d 592, 597 (1961).

■ The issue here, then, is whether the picketing by the striking employees of Dixie in front of the plaintiff's premises was primary picketing permitted by the proviso of § 158, or secondary picketing condemned by the preceding portion of the section.

Speaking generally, primary picketing or boycotting is designed to exert pressure on the employer, while secondary picketing or boycotting is designed to bring pressure on another than the employer.

31 Am. Jur., Labor §§ 462, 463, p. 768; 51A C. J. S., Labor Relations § 310, p. 111.

The defendants argue that their picketing on the street in front of the plaintiff's terminal was lawful primary picketing permissible under the proviso in subsection (B) of the statute, because, they say, the trucks were the "situs of employment for the strikers" and the "situs of the dispute" between Dixie, the primary employer, and its employees; that hence they had the right to picket the trucks wherever the vehicles might be. In other words, they say, this was a situation in which the business of the employer, Dixie, had a roving situs and picketing at such situs was permissible.

In support of their position the defendants rely upon *New Power Wire & Electric Corp.* v. *National Labor Relations Board*, 340 F. 2d 71 (2d Cir. 1965). There the employer was engaged in rewiring work in several apartment buildings. The strikers picketed at the employer's office and also at the various apartment buildings. It was held that picketing at the apartment buildings was permissible primary picketing because most of the nonstriking employees, at whom the picketing was directed, worked at these locations and not at the employer's office. 340 F. 2d at 73. Compare *National Labor Relations Board* v. *Associated Musicians of Greater New York, etc.*, 226 F. 2d 900, 905 (2d Cir. 1955).

More nearly in point with the present case is *National Labor Relations Board* v. *International Broth. of Teamsters, etc.*, 272 F. 2d 85 (2d Cir. 1959). There, in an attempt to organize the deliverymen of a warehouse, the union picketed the warehouse and the premises of customers where truck deliveries were being made. It was held that picketing on the premises of the customers was a secondary boycott activity prohibited by the National Labor Relations Act. The court pointed out that since all the employees at whom the picketing was being directed could be reached at the warehouse, and continuous picketing there was feasible and was being carried out, there was no justification for holding that the primary situs followed the trucks on their delivery rounds. 272 F. 2d at 88. See also, *National Labor Relations Board* v. *United Steelworkers of America*, 250 F. 2d 184, 187 (1st Cir. 1957).

Such was the situation in the present case. Not only could all the employees of Dixie, at whom the picketing was directed, be reached every day at its main plant, but picketing was being carried on there.

Hence, there was no justification for picketing these trucks as they were being taken to and from the plaintiff's terminal for servicing.

■ Moreover, in order for the picketing to be permissible under the roving situs doctrine which the defendants invoke, it must appear that the signs carried by the pickets clearly designated the employer, Dixie, against whom they were directed. *Local 761, International Union of Electrical*, etc., *Workers* v. *National Labor Relations Board*, *supra*, 366 U. S. at 677. The judgment of the trial court has settled the conflict in the evidence as to the wording of the signs, and according to the witness Chestnutt they carried no such clear indication.

The judgment is

*Affirmed.*